**In re COMARK, Debtor.**

**Sam JONAS, Chapter 7 Trustee, Plaintiff–Appellant,**

**v.**

**RESOLUTION TRUST CORPORATION, as Receiver for GreatAmerican Federal Savings & Loan Assoc., Defendant–Appellee.**

**No. 91–55182.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 1992.

Decided July 28, 1992.

Sean A. O'Keefe, and Marc J. Winthrop, Lobel, Winthrop & Broker, Irvine, Cal., for plaintiff-appellant.

Michael H. Krimminger, Resolution Trust Corp., Washington, D.C., for defendant-appellee.

Before: BRUNETTI, THOMPSON, and FERNANDEZ, Circuit Judges.

BRUNETTI, Circuit Judge:

In Bankruptcy Court, the trustee for Comark, a limited partnership, sought to recover the value of an alleged preferential transfer to GreatAmerican Federal Savings & Loan Association. The transfer occurred when Comark returned $9.25 million worth of securities to GreatAmerican that were "additional margin" in a securities transaction that the parties cancelled. On cross motions for summary judgment, the Bankruptcy Court ruled that while the transfer was a preferential transfer it was not avoidable because the return of the securities was either a "margin payment" or a "settlement payment." The district court affirmed.

## FACTS

This appeal arises from an adversary proceeding between the trustee ("Comark") for the debtor Comark and the receiver ("GreatAmerican") for the GreatAmerican Federal Savings & Loan Corporation. Although the transactions involved in this appeal are complex, the facts can be sorted out relatively easily.

Comark was involved in a sophisticated business of trading in government securities, known as "Ginnie Maes" ("GNMAs"). Each GNMA represents an interest in a pool of home mortgages. Comark entered into repurchase agreements ("Repos") and reverse repurchase agreements ("Reverse Repos"). In a Repo arrangement, the dealer sells specified securities to a purchaser, but also agrees to repurchase the securities later at the original price, plus an agreed upon additional amount usually represent-

ing interest on the original purchase price. A Reverse Repo basically is the reverse: the dealer buys securities and agrees to resell the securities to the seller in the future.[1] Reverse Repos can function as a loan. The seller receives cash for the securities, but must repurchase the securities in the future at the same price. Thus, the securities "sold" to the dealer can be viewed as being collateral for a loan.

Comark engaged in "matched book" transactions. Comark would sell Repos and then buy the equivalent in Reverse Repos, and profit by getting a greater rate of return on the securities it bought than it paid for the securities it sold.

Early in 1982 the parties engaged in the first of the transactions at issue in this appeal. Comark entered into six Reverse Repo agreements with GreatAmerican. Comark agreed to buy GNMAs, while GreatAmerican agreed to repurchase these GNMAs in December of 1982, at the same price, plus an additional interest payment. For each of the six Reverse Repos, GreatAmerican also delivered additional GNMAs to Comark ("Additional GNMAs"), beyond the GNMAs Comark actually purchased. As Comark itself notes, the Additional GNMAs "were intended to provide Comark additional margin for the purchase price." Shortly after the Comark–GreatAmerican Reverse Repo agreements, Comark entered into six "matching" Repo agreements with other firms.

The Additional GNMAs represented excess margin beyond what GreatAmerican was obligated to provide. Apparently, GreatAmerican's operational plans called for it to provide greater than required margin, to protect against additional margin calls in the event that the market value of the GNMAs declined significantly. Comark's book entries denoted the transferred securities as "Additional Securities Required to Meet 65% Loan Ratio." The Additional GNMAs had a market value of $9,259,208 when they were returned to GreatAmerican.

---

**1.** The opinion in *Bevill, Bresler, & Schulman Asset Management Corporation v. Spencer Savings & Loan Association,* 878 F.2d 742 (3d Cir. 1989), describes in greater detail the Repo market and its importance.

In the spring of 1982, Comark began to experience financial difficulties. It decided to withdraw from the securities market. On June 23, 1982, Comark, GreatAmerican, and the firms that "matched" the Comark–GreatAmerican Reverse Repos entered into an agreement. Comark withdrew as an intermediary. GreatAmerican and the firms on the Repo side contracted to complete the repurchase agreements directly with each other. GreatAmerican released Comark's obligation to resell the securities according· to the Reverse Repo agreements and the other firms released Comark's obligation to repurchase securities pursuant to the Repo agreements. Comark gave up its potential for profit.

That left the Additional GNMAs, which were in Comark's possession. These were returned to GreatAmerican June 18 and 22, and July 7 and 8.[2] Only the Additional GNMAs are involved in this action.

On September 1, 1982, Comark was forced into Chapter 7 bankruptcy. The trustee sought to recover the value of the Additional GNMAs as an avoidable preferential transfer. In response to cross motions for summary judgment, the Bankruptcy Court found that Comark had an interest in the Additional GNMAs; that GreatAmerican was a creditor; Comark was insolvent when it transferred the Additional GNMAs back to GreatAmerican; and that the transfer was within ninety days of the bankruptcy filing. Thus, the court held that the return of the Additional GNMAs was a preferential transfer. However, the Bankruptcy Court determined that GreatAmerican was protected from having the transfer avoided, because the transfer constituted a margin payment or a settlement payment under Bankruptcy Code § 546(e). 11 U.S.C. § 546(e).[3] Comark appealed directly to the district court, which affirmed.

## DISCUSSION

■■■ A Bankruptcy Court's conclusions of law are reviewed de novo. *Altura Partnership v. Breninc, Inc. (In re B.I. Fin. Servs. Group, Inc.),* 854 F.2d 351, 354 (9th Cir.1988). A court's grant of summary judgment is reviewed de novo. *See Guaranty Nat'l Ins. Co. v. Gates,* 916 F.2d 508, 511 (9th Cir.1990). The evidence is viewed in the light most favorable to the non-moving party to determine if there are any genuine issues of material fact and to determine whether the court correctly applied the law. *Id.* (citing *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986)). A reviewing court can uphold a grant of summary judgment on any ground supported by the record. *Jackson v. Southern Cal. Gas Co.,* 881 F.2d 638, 643 (9th Cir.1989) (citation omitted).

### I.

■■ Comark argues that GreatAmerican did not introduce sufficient evidence to support its construction of the statutory exemption from avoidance of preferential transfers under § 546(e). Comark reasons that because the terms "margin payment" and "settlement payment" are defined in the Bankruptcy Code by reference to common knowledge in the securities industry, see § 741(5), § 741(8), the meaning of the terms must be determined by considering expert evidence.

Comark is trying to turn a question of law into a question of fact. The courts that have interpreted the meaning of settlement payment and margin payment treat the question as one of statutory construction. *See, e.g., In re Kaiser Steel Corp.,* 952 F.2d 1230 (10th Cir.1991), *cert. denied sub nom. Kaiser Steel Resources, Inc. v. Pearl Brewing Co.,* —— U.S. ——, 112 S.Ct. 3015, 120 L.Ed.2d 887 (1992); *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913

---

**2.** Although Comark included these dates in its proposed findings of fact before the Bankruptcy Court, which were partially adopted by the court, Comark contends on appeal that all the transfers occurred on June 18. However, Comark admits that the GNMAs were returned because, as a result of Comark's withdrawal from the trades, it "no longer needed to retain these securities as collateral." As explained in Section II, *infra,* the dispute over the dates of the transfers is not significant.

**3.** In this opinion, all statutory citations are to the Bankruptcy Code, Title 11 of the United States Code.

F.2d 846 (10th Cir.1990); *Bevill, Bresler, & Shulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742, 745 (3d Cir.1989) ("issues before us are questions of first impression involving statutory interpretation"); *Jonas v. Farmer Bros. Co. (In re Comark)*, 124 B.R. 806 (Bankr.C.D.Cal.1991).

Comark acknowledges that the Additional GNMAs were given as "additional margin." It also acknowledges that the Additional GNMAs were returned because the securities were no longer required as collateral once Comark withdrew from the Repo/Reverse Repo transactions. The application of these undisputed facts to § 546(e) is a question of law. Thus, summary judgment was the proper mechanism for resolving the issues.

## II.

This appeal raises an important question of bankruptcy and securities law. Evidently Repo market transactions average several hundred billion dollars a day. *Bevill*, 878 F.2d at 753. Fortunately, the courts that have addressed the meaning of the term "settlement payment" in the Bankruptcy Code provisions at issue adopt a uniform approach. We follow our sister circuits in adopting a broad definition of settlement payment and find that the transfer at issue here, the return of the Additional GNMAs, was a settlement payment exempt from avoidance.

Section 546(e) protects "settlement payments," as defined in § 741(8), from being avoided as preferential transfers. Section 741(8) defines a "settlement payment" as a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or other similar payment commonly used in the securities trade.

■ Generally, a settlement is "the completion of a securities transaction." *See*

*Kaiser Steel Corp.*, 913 F.2d at 849 (quoting A. Pessin & J. Ross, *Words of Wall Street: 2000 Investor Terms Defined* 227 (1983)). Comark argues that the return of the Additional GNMAs was not part of any settlement. It maintains that no trade "settled" in this case, because Comark merely backed out of the transaction. Comark asserts that the actual Reverse Repo transaction were not completed until much later when the firms that assumed Comark's obligations actually resold the GNMAs to GreatAmerican. Comark's argument is not availing.

In *Bevill*, 878 F.2d at 742, the Third Circuit in a similar dispute, considered the meaning of settlement payment as defined in § 741(8), for the purposes of § 546(f). *Id.* at 751–53. Section 546(f) is very similar to § 546(e) and specifically protects margin payments and securities payments in connection with Repo transactions.[4]

In *Bevill*, the defendants entered into a Repo agreement, whereby the defendants agreed to buy securities from the plaintiff and then resell the securities to the plaintiff at a future date. 878 F.2d at 743. The terms of the Repo originally called for the plaintiff to retain possession of the securities. However, several weeks later the plaintiff transferred physical custody of the securities to the defendant (who actually owned them). *Id.* at 744. The plaintiff filed for bankruptcy less than ninety days after the transfer of securities and the trustee sought to avoid the transfer. *Id.*

The court extensively and eloquently considered the meaning of the term settlement payment. The court found it "clear that 'settlement payment' ... encompasses transfer of the purchased securities to the purchaser from the dealer." *Id.* at 752. The court interpreted settlement payment to "include[ ] transfers which are normally regarded as part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date

---

**4.** Congress added § 546(f) to make it clear that the § 546(e) protections extend to Repo transactions. *Bevill*, 878 F.2d at 747–48 (reviewing legislative history). Section 546(f) does not apply in the present appeal because it was enacted

after the bankruptcy case was filed. *See* Pub.L. No. 98–353, § 553, 98 Stat. 333, 392 (1984). The parties do not dispute the fact that § 546(e) is applicable to the transfers made in the present case.

in the settlement process for the particular type of transaction at hand." *Id.* The court held that the transfer of the securities from the plaintiff to the defendant was "a part of the settlement process" and thus a " 'settlement payment.' " *Id.* Therefore, the trustee could not avoid the transfer. *Id.* at 753.

The Tenth Circuit, in the context of a leveraged buy-out ("LBO"), also had occasion to consider the meaning of the term settlement payment, as defined by § 741(8). In *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913 F.2d at 846, the debtor-in-possession of Kaiser Steel Corporation sought to recover $162 million in cash and preferred stock transferred in exchange for Kaiser Steel Corporation's common stock in connection with the LBO. The court held that the LBO was a securities transaction and that the "transfer of money and preferred stock was the settlement of that transaction." *Id.* at 850. Thus, the transfer was exempt from avoidance as a settlement payment under § 546(e).

In its opinion the Tenth Circuit stated that the definition of settlement payment is extremely broad and "includes anything which may be considered a settlement payment." *Id.* at 848 (citations omitted); *accord In re Kaiser Steel Corp.,* 952 F.2d at 1237; *In re Comark,* 124 B.R. at 816; *Blanton v. Prudential–Bache Sec., Inc. (In re Blanton),* 105 B.R. 321, 347 (Bankr. E.D.Va.1989).

We have not yet considered the meaning of the term settlement payment. We now join with the Third and Tenth Circuits and broadly define the term settlement payment. A settlement payment clearly includes a transfer of securities that completes a securities transaction. *Bevill,* 878 F.2d at 752. Therefore, a transfer of securities needed to complete a Repo transaction is a "settlement payment." *Id.* This includes any transfers that occur during the settlement process. *Id.* In the present case, Comark's withdrawal from the Reverse Repo agreement was a Repo "transaction" and the return of the Additional GNMAs was a transfer of securities necessary to complete the transaction and return Comark and GreatAmerican to a kind of status quo ante. Regardless of whether all the securities were transferred on June 18th as Comark now argues, or whether they occurred from June 18th until July 8th as the Bankruptcy Court found, the transfer occurred during the settlement process. Thus, the transfer was an unavoidable settlement payment.

Comark attempts to distinguish *Bevill* by arguing that no trade "settled" when it removed itself from the transaction in June of 1982. Comark contends that its rescission of the Reverse Repo agreements with GreatAmerican was unusual and therefore the return of the Additional GNMAs cannot be considered "normally" part of a settlement payment.

We reject this argument. In accordance with the Reverse Repo agreement, GreatAmerican sold GNMAs to Comark. GreatAmerican also forwarded the Additional GNMAs to Comark as excess margin. Comark sold the GNMAs it purchased from GreatAmerican to other brokerage firms, but maintained possession of the Additional GNMAs. When Comark decided to back out of the Reverse Repos, the Additional GNMAs had to be dealt with. The return of the Additional GNMAs was a step in the process of "settling" Comark's withdrawal from the Reverse Repo arrangements. Neither party reasonably could consider Comark's withdrawal "settled" until GreatAmerican received the over $9 million dollars worth of securities Comark had in its possession.

In light of our decision that the return of the Additional GNMAs was an unavoidable settlement payment, we do not consider the alternative ground relied upon by the district court, that the return of the Additional GNMAs was a "margin payment." It also is unnecessary for us to address the other arguments raised in defense by GreatAmerican.

The decision of the district court is affirmed.

AFFIRMED.