176 B.R. 895 (1995)
In re HAMILTON TAFT & COMPANY, Debtor.
Frederick S. WYLE, Trustee of Hamilton Taft & Company, Plaintiff,
v.
HOWARD, WEIL, LABOUISSE, FRIEDRICHS INCORPORATED, a Louisiana corporation; Howard Weil Financial Corporation, a Louisiana corporation; and Legg Mason, Inc., a Maryland corporation, Defendants.
Bankruptcy No. 91-3-1077-TC. Adv. No. 93-3-121-TC.
United States Bankruptcy Court, N.D. California.
January 19, 1995.
*896 *897 J. Michael Kelly, Cooley Godward Castro, San Francisco, CA (Thomas K. Potter, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, of counsel), for defendants Howard, Weil, Labouisse, Friedrichs Inc., Howard Weil Financial Corp. and Legg Mason, Inc.
L.J. Chris Martiniak, Feldman, Waldman & Kline, San Francisco, CA, for plaintiff Frederick S. Wyle, Trustee.

OPINION
THOMAS E. CARLSON, Chief Judge.
The principal question in this case is whether section 546(e) of the Bankruptcy Code bars a trustee from recovering as a fraudulent conveyance transfers made by a stockbroker pursuant to a reverse repurchase agreement used to facilitate a leveraged buy out. I conclude that there are no genuine issues of material fact and that section 546(e) bars trustee's action, and therefore grant summary judgment for defendant.
FACTS
The material facts are not in dispute. On December 30, 1987, MaxPharma, Inc. paid Connecticut General Corporation (CIGNA) $500,000 for an option entitling it to purchase stock of Debtor Hamilton Taft & Company (Debtor) from CIGNA for $4,100,000. MaxPharma could exercise the option only through January 29, 1988. The $500,000 option price was applicable to the purchase price, but was otherwise non-refundable. MaxPharma was unable to find a lender willing to arrange financing through a "stock loan," whereby Debtor's stock would be used as collateral to secure the loan. Defendant Howard, Weil, Labouisse, Friedrichs Incorporated (Defendant) informed MaxPharma that it did not make "stock loans," but could lend money with a treasury bill as security by performing a reverse repurchase transaction.
On January 28, 1988, Debtor wired $5.0 million to Defendant. On January 29, 1988, Defendant used approximately $4.9 million of those funds to purchase for Debtor a 90-day T-Bill having a face value of $5.0 million. On the same day, Debtor sold the T-Bill back to Defendant for $4.1 million, subject to a reverse repurchase agreement, under which Debtor agreed to repurchase the T-Bill in 90 days for the sale price plus interest.
What happened to the $4.1 million is contested by the parties. Debtor's chapter 11 trustee (Trustee) contends that the $4.1 million was transferred directly to MaxPharma immediately upon sale of the T-Bill. Defendant claims that it credited Debtor's account for $4.1 million, and that those funds were subsequently wired to MaxPharma. For the purpose of the present motion, I accept Trustee's version of the facts. It is undisputed that Debtor transferred the funds to MaxPharma at the request of Debtor and that MaxPharma used $3.6 million to purchase Debtor's stock from CIGNA.
When the 90-day repurchase agreement matured, Debtor rolled over its obligation into new T-Bills and later into T-Notes. In January 1989, Debtor directed Defendant to sell the T-Notes and apply the proceeds to satisfy Debtor's obligation under the reverse repurchase agreement.
Creditors filed an involuntary chapter 11 petition against Debtor on March 20, 1992. Trustee was appointed on March 26, 1992. An order for relief was entered on May 31, 1992. Trustee filed the present action on March 26, 1993. Trustee contends that the transaction involving Debtor, Defendant, and MaxPharma was in substance a leveraged buy out (LBO), in which MaxPharma used Debtor's funds to purchase CIGNA's stock in Debtor. Trustee further contends that the transaction rendered Debtor insolvent and that the LBO therefore constituted a fraudulent conveyance. In the present action, Trustee seeks to recover, pursuant to California Civil Code sections 3439.04 and 3439.05 and Bankruptcy Code section 544, the value of the $5.0 million T-Bill transferred from Debtor to Defendant on January 29, 1988, or the $4.1 million proceeds of the sale of that T-Bill that were transferred from Defendant to MaxPharma the same *898 day.[1] Trustee and Defendant filed cross motions for summary judgment.
DISCUSSION

I

Standard for Summary Judgment
"Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1250 (9th Cir.1982), cert. denied, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

II

Section 546(e) Defense
Defendant contends that Trustee's action is barred under section 546(e) of the Bankruptcy Code. That section provides:
[n]otwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101(34), 741(5), or 761(15) of this title, or settlement payment, as defined in section 101(35) or 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.
11 U.S.C. § 546(e). Congress enacted section 546(e) "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." Kaiser Steel Resources, Inc. v. Jacobs, 110 B.R. 514, 522 (D.Colo.1990), aff'd, 913 F.2d 846 (10th Cir.1990) (citation omitted). Trustee does not contest many of the elements of the section 546(e) defense: that Defendant is a stockbroker, that the T-Bill transferred was a security, and that the present action is brought under section 544. Trustee contends that section 546(e) does not apply, however, because: (i) the transaction was not a true repurchase agreement (Repo), (ii) the transfer of the T-Bill to Defendant was not a "settlement payment," (iii) the present transaction is governed by section 546(f), and (iv) section 546(e) should not be applied to LBOs.
A. Whether Transaction a True Repo
Defendant characterizes its transaction with Debtor as a reverse repurchase agreement (Reverse Repo). The Ninth Circuit has held that Repos and Reverse Repos are securities transactions covered by section 546(e). In re Comark, 971 F.2d 322, 325 (9th Cir.1992) (Comark I); In re Comark, 145 B.R. 47, 52-53 (Bankr. 9th Cir.1992) (Comark II). The Ninth Circuit has described the characteristics of Repos and Reverse Repos as follows.
In a Repo arrangement, the dealer sells specified securities to a purchaser, but also agrees to repurchase the securities later at the original price, plus an agreed upon additional amount usually representing interest on the original purchase price. A Reverse Repo basically is the reverse: the dealer buys securities and agrees to resell the securities to the seller in the future. Reverse Repos can function as a loan. The seller receives cash for the securities, but must repurchase the securities in the future at the same price. Thus, the securities "sold" to the dealer can be viewed as being collateral for a loan.
Comark I, 971 F.2d at 323 (footnote omitted). Accord 11 U.S.C. § 101(47).
Trustee contends that the transaction between Defendant and Debtor was not a true Reverse Repo, but rather was a sham used to conceal the fact that Debtor's funds were being used to fund an LBO. Trustee notes that Debtor used $5.0 million cash to buy a T-Bill, then immediately sold the T-Bill subject to the Reverse Repo, leaving itself essentially in the place it started. Because there was no net borrowing of funds, which is the essential characteristic of a Reverse Repo, Trustee argues, the transaction is not entitled to protection under section 546(e). This argument is unpersuasive.
*899 First, the transaction constituted a Reverse Repo in the objective sense. Debtor sold a T-Bill to Defendant and agreed to repurchase it again later for the sale price plus interest. Whether a transaction is a Repo or Reverse Repo covered under section 546(e) is to be governed by an objective test. See Comark II, 145 B.R. at 53. Courts have noted that there are several varieties of genuine Repo transactions. See Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n, 878 F.2d 742, 746 (3rd Cir.1989); Comark II, 145 B.R. at 50 n. 6. Several courts have also held that section 546(e) covers unusual as well as routine securities transactions. See Comark I, 971 F.2d at 326; Kaiser Steel Corp. v. Charles Schwab & Co., Inc., 913 F.2d 846, 849 n. 6 (10th Cir.1990) (Kaiser I); In re Kaiser Steel Corp., 952 F.2d 1230, 1238-40 (10th Cir.1990), cert. denied, ___ U.S. ___, 112 S.Ct. 3015, 120 L.Ed.2d 887 (1992) (Kaiser II).
Second, whether or not it was a conventional Reverse Repo, the transaction between Defendant and Debtor was clearly a securities transaction. Section 546(e) does not cover only Repos and Reverse Repos; it covers all types of securities transactions. "[S]ection 546(e) . . . includes a transfer of securities that completes any securities transaction." Comark II, 145 B.R. at 52. The transaction between Debtor and Defendant in substance reduces to the following. Debtor purchased a T-Bill from Defendant then sold it back to Defendant. Whatever else it was, this transaction was a transfer of securities. See Kaiser II, 952 F.2d at 1239-40 (transfer of securities that is part of LBO is a securities transaction covered by section 546(e)).
B. Whether Transfer a "Settlement Payment"
Trustee argues that the transfers involving Defendant are not protected under section 546(e) because they do not constitute settlement payments. "Settlement payment" is defined in section 741(8) of the Bankruptcy Code.
"[S]ettlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.
11 U.S.C. § 741(8). The Ninth Circuit has construed the term very broadly.
We now join with the Third and Tenth Circuits and broadly define the term settlement payment. A settlement payment clearly includes a transfer of securities that completes a securities transaction.
Comark I, 971 F.2d at 326 (citation omitted). Accord Comark II, 145 B.R. at 52.
Trustee first argues that the initial transfer of the T-Bill to Defendant was not a settlement payment because it did not complete the Reverse Repo. This argument is wholly unpersuasive. The clear thrust of both Comark I and Comark II is that "settlement payment" includes any transfer of cash or securities toward completion of a securities transaction. See Comark I, 971 F.2d at 326; Comark II, 145 B.R. at 52. To hold that section 546(e) does not apply to the initial transfer of securities to a broker handling a Reverse Repo would eviscerate section 546(e) and frustrate Congress's intent in enacting it, by leaving the broker open to suit for doing nothing more than handling a securities transaction for the debtor.[2]
Trustee next argues that the transfer to MaxPharma of the $4.1 million proceeds of the sale of the T-Bill was not a settlement payment because the payment was not made to Debtor, the other party to the Reverse Repo. This argument is frivolous. It is *900 undisputed that the funds were transferred to MaxPharma at the direction of Debtor. In directing payment of the sale proceeds to MaxPharma, Debtor exerted dominion over the funds and used them for its own purposes. Thus, from the viewpoint of Defendant, payment to MaxPharma constituted payment to Defendant and fulfilled Defendant's obligation under the first leg of the Reverse Repo.[3]
C. Must Defendant Satisfy Section 546(f)?
Trustee argues that section 546(f) governs Repo transactions and that Defendant is not entitled to protection under that statute. Section 546(f) provides:
[n]otwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, made by or to a repo participant, in connection with a repurchase agreement and that is made before the commencement of the case, except under section 548(a)(1) of this title.
11 U.S.C. § 546(f). Section 101(46) defines "repo participant" as follows:
"repo participant" means an entity that, on any day during the period beginning 90 days before the date of the filing of the petition, has an outstanding repurchase agreement with the debtor;
11 U.S.C. § 101(46).
Trustee argues that section 546(f) governs, because it is the more specific statute, expressly addressing Repo transactions. Trustee argues that Defendant is not protected under section 546(f), because any Reverse Repo transaction between Defendant and Debtor closed more than 90 days prepetition, and Defendant is therefore not a "repo participant" under section 101(46).
Both the statutory language and legislative history indicate that section 546(f) was intended to address Repo transactions not already covered by section 546(e) rather than to narrow the application of 546(e). Section 546(e) protects only a "commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency." Section 546(f) protects additional participants in certain Repo transactions. The legislative history to section 546(f) states in relevant part:
the proposed amendments are intended to afford participants in the repo market the same treatment with respect to the stay and avoidance provisions of the Code that Public Law 97-222 explicitly provided stockbrokers, securities clearing agencies, commodity brokers and forward contract merchants in connection with securities contracts, commodity contracts and forward contracts.
S.Rep. No. 65, 98th Cong., 1st Sess. 45, 49 (1983). The same legislative history states clearly that section 546(e) continues to protect stockbrokers engaged in Repo transactions.
These amendments are not intended, however, to affect the status of repos involving securities or involving commodities as securities contracts, commodity contracts, or forward contracts, and their consequent eligibility for similar treatment under other provisions of the Code, such as the provisions giving protection to stockbrokers, securities clearing agencies, commodity brokers, and forward contract merchants for liquidation and setoff in respect of securities contracts, commodity contracts or forward contracts.
Id. See also Comark II, 145 B.R. at 52-53. In summary, section 546(f) was intended to supplement rather than narrow section 546(e), and a defendant that qualifies under 546(e) as a stockbroker need not qualify under section 546(f) as a repo participant.
*901 D. Is There an LBO Exception to Section 546(e)?
Trustee argues that 546(e) should not be interpreted to protect a stockbroker involved in a securities transaction that implements an LBO, relying on Lippi v. City Bank, 955 F.2d 599 (9th Cir.1992), Kendall v. Sorani, 151 B.R. 1012 (Bankr.N.D.Cal.1993), and Wieboldt Stores Inc. v. Schottenstein, 131 B.R. 655 (N.D.Ill.1991). Trustee contends that this LBO exception to section 546(e) applies with special force in the present case, because Defendant knew Debtor was rendered insolvent by the transaction. Trustee's argument is not supported by the authorities cited.
Trustee's reliance on Wieboldt is misplaced. That case held that section 546(e) did not preclude a fraudulent conveyance action against shareholders whose shares were purchased in an LBO. In the present action, Trustee seeks recovery not from former shareholders, but from a stockbroker that transferred certain securities as a part of the LBO. The Wieboldt court carefully noted that its holding did not leave the stockbroker handling the LBO open to suit. The court acknowledged that the purpose of section 546(e) was to protect brokerage firms, and then stated:
in the instant case, however, requiring the [shareholders] to return to the Trustee payments they received . . . poses no significant threat to those in the clearance and settlement chain.
Wieboldt, 131 B.R. at 664 (footnote omitted). The court also quoted with approval the following excerpt from the law review article it had previously cited in holding that section 546(e) does not protect selling shareholders.
"Neither the system of guarantees nor the solvency of participants in the chain is threatened by a legal order in which payments to the shareholders by their brokers are subject to recovery by a trustee in bankruptcy. Thus, while the flows of funds to and between financial intermediaries in the clearance and settlement chain must be protected in order to insure the stability of those systems, funds flowing from the intermediaries to the shareholders do not require protection, and section 546(e) should therefore not apply."
Id. at 664 n. 11 (quoting Neil M. Garfinkel, Note, No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO, 1991 Colum.Bus.L.Rev. 51, 61-63).
The Tenth Circuit has held that there is no LBO exception to section 546(e). That court has applied section 546(e) to bar recovery both from the brokerage handling the transfer of shares in an LBO, see Kaiser I, and from the selling shareholders, see Kaiser II. The court noted that the plain language of section 546(e) covers LBOs as well as more conventional securities transactions and reasoned "it would be an act of judicial legislation to establish such a limitation." Kaiser I, 913 F.2d at 850.
In short, only Wieboldt supports any LBO exception to section 546(e), but even that case does not permit an action against the stockbroker handling the securities transactions involved in the LBO.
Trustee's reliance on Lippi and Kendall is equally misplaced. In each of those cases, the plaintiff sought recovery from the bank that financed the LBO. In neither case did section 546(e) even arguably apply, and neither opinion mentions that statute.
Finally, assuming arguendo that Defendant knew the Reverse Repo was part of an LBO and that the LBO rendered Debtor insolvent, such knowledge does not bar application of section 546(e). Section 546(e) contains a limited exception for cases involving actual fraud. The statute does not bar actions brought under section 548(a)(1) of the Bankruptcy Code, which allows a trustee to recover a transfer made within one year before the petition date with actual intent to hinder, delay, or defraud creditors. Section 546(e) does bar actions brought under section 544 (using state fraudulent conveyance statutes) to recover transfers made more than one year prepetition with actual intent to hinder, delay, or defraud creditors. Thus, it is clear Congress intended to prohibit recovery of "settlement payments" received by stockbrokers more than one year prepetition, irrespective of the stockbroker's mental state. Because the transfers at issue here *902 occurred more than one year prepetition and Trustee's action is brought under section 544, Defendant's knowledge about the LBO and its effect on Debtor is irrelevant.

III

Aiding And Abetting
Trustee asserts that even if his action to avoid the transfers to Defendant are barred by section 546(e), he may recover damages from Defendant under state law on the theory that Defendant aided and abetted the fraudulent LBO. Trustee argues that liability for damages for aiding and abetting a fraudulent transfer is not barred by section 546(e). Defendant argues that Trustee's aiding and abetting theory fails because: (i) Trustee failed to plead it as a separate claim for relief; (ii) no such cause of action exists under California law; (iii) Trustee lacks standing to assert such a cause of action; and (iv) any such cause of action is barred by section 546(e). I determine that the Trustee lacks standing to assert the aiding and abetting claim.
California courts permit a creditor to recover civil damages from those who conspire to transfer property of a debtor to hinder, delay, or defraud creditors. See Taylor v. S & M Lamp Co., 190 Cal.App.2d 700, 706, 12 Cal.Rptr. 323 (1961); Hickson v. Theilman, 147 Cal.App.2d 11, 15, 304 P.2d 122 (1956). A debtor's bankruptcy trustee, however, is not authorized to pursue every action that creditors of the debtor might pursue. Cf. In re Ozark Restaurant Equipment Co., Inc., 816 F.2d 1222, 1226-30 (8th Cir.), cert. denied, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987). A trustee's only authority to assert creditor's state-law causes of action related to fraudulent conveyances is found in section 544(b) of the Bankruptcy Code.[4] That section only permits the trustee to avoid a fraudulent transfer.
The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 502 of this title or that is not allowable only under section 502(e) of this title.
11 U.S.C. § 544(b) (emphasis added). The Ninth Circuit has squarely held that a trustee's power to avoid fraudulent transfers does not enable a trustee to recover damages for aiding and abetting a fraudulent transfer.
The Act carefully speaks of conveyances of property as being "null and void," and authorizes suit by the trustee to "reclaim and recover such property or collect its value." The actions legislated against are not "prohibited"; those persons whose actions are rendered "null and void" are not made "liable"; and terms such as "damages" are not used. The legislative theory is cancellation, not the creation of liability for the consequences of a wrongful act.
Elliott v. Glushon, 390 F.2d 514, 516 (9th Cir.1967) (footnote omitted).
In short, Trustee's only authority to bring state-law claims of creditor's is section 544(b), and section 544(b) does not authorize Trustee to assert a claim for aiding and abetting a fraudulent transfer.
CONCLUSION
Bankruptcy Code section 546(e) bars Trustee's fraudulent transfer action against Defendant. Trustee lacks standing to sue Defendant for aiding and abetting a fraudulent conveyance. Accordingly, I grant summary judgment in favor of Defendant.
NOTES
[1] Trustee previously filed a similar action against CIGNA. That action was settled by the parties before trial.
[2] Trustee contends that Defendant's expert witness testified that the initial transfer of the T-Bill to Defendant was not a settlement payment. This argument fails for two reasons. First, the relevant historical facts are undisputed. The application of section 546(e) to those facts is question of law, not a question of fact subject to expert testimony. See Comark I, 971 F.2d at 324-25. Second, Trustee mischaracterizes the testimony of Defendant's expert, Dr. Marcia L. Stigum. Dr. Stigum's testimony, taken as a whole, supports a finding that the initial transfer of the T-Bill was a settlement payment. Plaintiff failed to submit affidavits controverting that testimony.
[3] Trustee's separate statement of undisputed facts asserts that Debtor's instructions to Defendant to transfer the proceeds to MaxPharma were not properly authorized by Debtor's board and were therefore ultra vires. The facts asserted by Trustee clearly establish that the instructions were made with at least apparent authority, and that Debtor implicitly ratified the transaction after the fact. Moreover, Trustee raise no ultra vires argument in the memoranda filed in support of his motion for summary judgment or in opposition to Defendant's motion for summary judgment.
[4] Section 548 of the Bankruptcy Code creates a federal cause of action for recovery of a fraudulent conveyance. Trustee cannot use section 548, however, because that statute only permits avoidance of transfers made within one year of the petition date. It is undisputed that all transfers to Defendant occurred more than one year before the bankruptcy petition was filed.