**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No. NV-14-1575-DJuKi |
| ) | |
| ERIK B. HEBERT, ) | Bk. No. 13-17429-MKN |
| ) | |
| Debtor. ) | Adv. Proc. No. 13-01213-MKN |
| _____ ) | |
| ERIK B. HEBERT, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| SANDY RAKICH, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on February 18, 2016
at Las Vegas, Nevada

Filed - February 23, 2016

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Mike K. Nakagawa, Bankruptcy Judge, Presiding

Appearances:    Christopher P. Burke argued for Appellant; Matthew
C. Zirzow of Larson & Zirzow LLC argued for
Appellee.

Before:   DUNN, JURY, and KIRSCHER, Bankruptcy Judges.

---

[1]   This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

Sandy Rakich loaned $280,000 to NOE Investments, Inc. ("NOE"), which loan was guaranteed by Debtor Erik B. Hebert and his cousin, Todd Jagiello.

In 2011, Ms. Rakich obtained a judgment ("Jagiello Bankruptcy Judgment") in Mr. Jagiello's bankruptcy case in the Bankruptcy Court for the Eastern District of Michigan, determining that Mr. Jagiello's obligation to her was nondischargeable pursuant to § 523(a)(2).[2]

Mr. Hebert testified as a witness on behalf of Mr. Jagiello at the nondischargeability trial. In entering the Jagiello Bankruptcy Judgment, the Michigan Bankruptcy Court determined, inter alia, that Mr. Jagiello and Mr. Hebert had acted together to cheat Ms. Rakich out of her money for their own personal purposes.

After Mr. Hebert filed his own bankruptcy case in the Bankruptcy Court for the District of Nevada, the Nevada Bankruptcy Court granted summary judgment on Ms. Rakich's § 523(a)(2)(A) claim based upon Mr. Hebert's testimony given at the Jagiello nondischargeability trial and based upon the Jagiello Bankruptcy Judgment.

We AFFIRM.

## I.   FACTUAL BACKGROUND

The parties to this dispute are Sandy Rakich and Erik B.

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

Hebert. Ms. Rakich met Mr. Hebert while they were students at the University of Southern California. In early 2006, Ms. Rakich and Mr. Hebert were in a personal relationship. At some point Ms. Rakich, a teacher, expressed to Mr. Hebert a need to make more money; she recently had become a licensed real estate agent and hoped to take advantage of the hot real estate market in Southern California. Mr. Hebert, who describes himself as an "enterpreneur," had begun exploring options to "flip" properties to take advantage of the rising market.

Mr. Hebert learned of a project involving property in Long Beach, California, owned by a friend of his. Mr. Hebert spoke with his cousin, Todd Jagiello, who did construction work in Michigan, about coming to Southern California to act as contractor for the Long Beach project. He then discussed with Ms. Rakich the possibility of her participation in the Long Beach project as a lender or investor.

Ultimately, in April 2006, Mr. Hebert formed NOE. Ms. Rakich contends that Mr. Hebert promised her that if she invested in NOE she would receive a 50% return on her money and would be retained as the real estate agent for the purchase and sale of properties.

On April 29, 2006, Ms. Rakich entered into a written agreement ("NOE Agreement"), pursuant to which she agreed to loan NOE $280,000. The NOE Agreement was signed by Mr. Jagiello on behalf of NOE and by Mr. Hebert and Mr. Jagiello as guarantors.

On May 24, 2006, at the direction of Mr. Jagiello, Ms. Rakich transferred $280,000 to Mr. Jagiello's personal bank account at Wells Fargo Bank. Shortly thereafter, Mr. Jagiello

-3-

transferred at least $158,000 to Mr. Hebert, personally. Without informing Ms. Rakich, Mr. Hebert and Mr. Jagiello agreed between themselves that they would not go forward with the Long Beach project, but rather, each would diversify their opportunities using Ms. Rakich's funds without using the NOE company name for the investments.

For his part, Mr. Hebert invested the $158,000 in a restaurant remodel/expansion that would serve a large housing development in Los Angeles. However, the housing development stalled, the restaurant project failed, and Mr. Hebert lost the entire investment. Mr. Jagiello used a portion of the $280,000 he retained on projects of his own, none of which were in California and none of which proved successful. Much of his use of the funds appears to have been personal.

The NOE Agreement required that Ms. Rakich receive monthly payments. She did receive seven payments that cleared. Each payment came from Mr. Jagiello, using the funds he originally had received from Ms. Rakich. When the payments stopped, and Ms. Rakich learned that her funds never had been invested in the Long Beach project, she commenced litigation against Mr. Hebert and Mr. Jagiello in the Superior Court for the County of Los Angeles, California. After the defendants failed to file answers, on May 21, 2008, Ms. Rakich obtained a default judgment ("California Judgment") against each of them in the amount of $342,594.41. The underlying complaint asserted claims for relief for breach of contract, for account stated, and for monies due on an open account. No fraud claim was included.

On October 28, 2011, Mr. Jagiello filed a chapter 7 petition

-4-

in the United States Bankruptcy Court for the Eastern District of Michigan. On August 8, 2013, a judgment ("Jagiello Bankruptcy Judgment") excepting the debt owed to Ms. Rakich from discharge was entered in the adversary proceeding Ms. Rakich initiated pursuant to § 523(a)(2).

Mr. Hebert appeared at the trial in the adversary proceeding as a witness on behalf of Mr. Jagiello. Of significance to this appeal, Mr. Hebert testified under oath that Mr. Jagiello was his "cousin and business partner."

In support of the Jagiello Bankruptcy Judgment, the Michigan Bankruptcy Court made extensive findings and conclusions with respect to the NOE Agreement and NOE itself:

> Quite clearly, based on the language of the [NOE] Agreement itself and the testimony, [NOE], as a separate entity, was to be the focal point of the [NOE] Agreement and the principal party in interest with regard to the loan. [NOE] was supposed to use proceeds of the loan to enter into real estate transactions contemplated by the [NOE] Agreement, and it was to be the beneficiary of those transactions.
>
> Thus, the existence and status of [NOE] is an important aspect of this proceeding. As to that, the Court concludes the facts are as follows: (a) [NOE] was incorporated in Nevada on April 24, 2006, by Hebert, who is listed as its Resident Agent with a Las Vegas street address (although he was apparently living in California at the time); (b) its initial capitalization was $2,000.00, it being unclear whether or not any stock certificates were ever in fact issued or whether that rather small amount was paid into the entity by Hebert for that stock; (c) its sole initial shareholder was Hebert; (d) its charter was at some point revoked; (e) it appears, based on [Mr. Jagiello's] Exhibit B, that its business license had at some point expired; (f) there is no evidence that it filed a list of its officers, which said exhibit indicates was due on May 31, 2006; (g) it never had a bank account and did not, itself as an entity, engage in any business or transactions contemplated by the [NOE] Agreement, let alone any other transactions, within its stated purpose of "Real estate and inventions"; (h) it did not ever as an entity receive any of the monies that [Ms. Rakich]

-5-

put into the project; (I) [Mr. Jagiello] did not become and was not an officer or director of that entity; and (j) no corporate records, resolutions, tax returns, or any other such documentation was produced evidencing any corporate books, records, or activity relevant to this proceeding or its existence.

. . . .

From the foregoing and the other surrounding facts the Court concludes that (1) the formation of [NOE] was essentially a window dressing created to be able to show only that such an entity actually existed, in case anyone asked about it; (2) it was never intended that it would have any substance or role, or that it would operate or carry out the purposes of the [NOE] Agreement (or likely be used for any other purpose), as was clearly contemplated it would do by the language of that [NOE] Agreement; (3) if there was ever any other purpose or need for that entity, it was to serve the personal or business purposes of Hebert. That these factual conclusions are appropriate are buttressed by the testimony and demeanor of Hebert himself, which, as viewed by the Court, reflected an attitude of disdain, or if not that, what might be termed a form of financial amorality or attitude of unimportance or lack of appreciation when it came to such things as (a) observing the distinctness between a corporate entity and its shareholder, (b) proper accounting and record keeping, (c) filing tax returns, (d) observing ordinary commercial practices and rules and requirements relative to proper documentation of transactions, and (e) other such things as were likely the subject of, and taught him, in his college classes in entrepreneurship and marketing. He seemed to believe that such things were just bothersome or technical niceties that could either be initially ignored or later, and after the fact, easily manipulated or corrected if the need arose.

. . . .

When you add together (a) the recited facts and conclusions as respects [NOE]; (b) the facts surrounding the formation and entering into the [NOE] Agreement itself; (c) what actually happened to the money soon after it was paid by [Ms. Rakich], i.e.: to whom it was actually paid over to, what it was used for, and by whom it was used; and (d) the exclusion of [Ms. Rakich] from the process, i.e.: given the nature and uses of the monies, she did not and likely could not have provided services as or benefitted as an agent or broker in connection with any of the actual transactions that took place, despite the fact that such was one of the "purposes" of the [NOE] Agreement;

-6-

the Court concludes that what was involved here was a scheme and artifice to obtain the funds from [Ms. Rakich] in order to use them, not for what the [NOE] Agreement initially contemplated (more likely particularly the Long Beach Project but even arguably other transactions as well), but for Hebert and [Mr. Jagiello's] personal and separate uses, projects, or investments. The Court concludes that this was their intention certainly as of the date the [NOE] Agreement was signed (and maybe before), in the apparent hope that in doing so they might benefit to the extent that they would be able to make the payments to [Ms. Rakich] required and guaranteed by the [NOE] Agreement - payments that to the limited extent made, were entirely made from the funds she had paid in and not from any transactions entered into by Hebert or [Mr. Jagiello] that produced any income or funds which could have been available to repay the obligation.

In the Court's view, the facts support a conclusion that [Ms. Rakich's] funds were obtained by way of deceit, artifice, trick or design involving direct and active operation of [Mr. Jagiello] and Hebert's minds, with the result of essentially cheating [Ms. Rakich] out of her money, for their own personal purposes.

Mr. Hebert filed his own chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Nevada on August 28, 2013. Mr. Hebert listed Ms. Rakich as a creditor on his Schedule F. Ms. Rakich filed a timely complaint seeking a determination that the debt Mr. Hebert owed Ms. Rakich in the amount of the California Judgment was nondischargeable pursuant to § 523(a)(2)(A) ("Hebert Adversary Proceeding"). Mr. Hebert filed an answer which contained twenty-five affirmative defenses.

Ms. Rakich filed a motion for summary judgment ("SJ Motion"), supported by her statement of undisputed material facts and her declaration. The record in support of the SJ Motion included a complete transcript of the trial in the Jagiello Adversary Proceeding. Ms. Rakich asserted she was entitled to summary judgment, because (1) Mr. Hebert, in his testimony in the Jagiello Adversary Proceeding which involved the

-7-

same transaction that was the subject of the Hebert Adversary Proceeding, acknowledged that he was the decision-maker with regard to the transaction, (2) based upon the testimony of Ms. Rakich and admissions by Mr. Hebert and Mr. Jagiello, the Jagiello Bankruptcy Judgment was entered holding Mr. Jagiello's debt to Ms. Rakich nondischargeable pursuant to § 523(a)(2), and (3) Mr. Hebert acknowledged that his was greater culpable conduct than Mr. Jagiello with regard to the transaction involving Ms. Rakich because he was the one directing and telling Mr. Jagiello what to do.

Mr. Hebert opposed the SJ Motion. In his "Separate Statement of Disputed Facts," and in his declaration in opposition to the SJ Motion, Mr. Hebert asserted, inter alia, that Mr. Jagiello was the authorized agent of NOE, that Ms. Rakich was paid back approximately $25,000 over a seven month period, that the California Judgment contained no cause of action for fraud, and that Ms. Rakich conducted no discovery in the Hebert Adversary Proceeding. Mr. Hebert later filed a supplement to his opposition to the SJ Motion, which included his supplemental declaration, the purpose of which appears to have been to dispute the assertion that Ms. Rakich had been "swindled out of any money." In particular, he attached an email Ms. Rakich sent him approximately three months after the California Judgment had been entered, which he interpreted as an indication Ms. Rakich wanted to do further business with him.

The Nevada Bankruptcy Court granted the SJ Motion. In its opinion, the Nevada Bankruptcy Court reviewed the transcript of the trial in the Jagiello Adversary Proceeding and the findings

-8-

of fact and conclusions of law in support of the Jagiello Bankruptcy Judgment. The Nevada Bankruptcy Court determined that those findings were sufficient to establish a § 523(a)(2)(A) claim against Mr. Hebert, based on preclusion principles, where Mr. Hebert was in privity with Mr. Jagiello with respect to Ms. Rakich's loan.

Mr. Hebert appealed the order granting the SJ Motion and the Summary Judgment itself.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES[3]

Whether the Nevada Bankruptcy Court erred when it granted summary judgment against Mr. Hebert based upon the Jagiello Bankruptcy Judgment, which involved a different defendant in a different state.

Whether the Nevada Bankruptcy Court erred when it used the Jagiello Bankruptcy Judgment to hold that the California Judgment, a default judgment, was nondischargeable.

---

[3] Mr. Hebert also asserts on appeal that the Nevada Bankruptcy Court erred in relying on the Jagiello Bankruptcy Judgment where the Michigan Bankruptcy Court did not consider whether Bullock v. BankChampaign NA, 133 S.Ct. 1754 (2013), affected the interpretation of § 523(a)(2) elements. We previously have rejected this argument. Hart v. Karaeff (In re Hart), 2015 WL 845569 (9th Cir. BAP Feb. 26, 2015)("There is no indication that the holding in Bullock heightens the state of mind required for fraud under § 523(a)(2)(A) as already required in this Circuit.").

-9-

## IV.  STANDARDS OF REVIEW

We review summary judgment determinations de novo.  See Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014); Shahrestani v. Alazzeh (In re Alazzeh), 509 B.R. 689, 692–93 (9th Cir. BAP 2014).  "Viewing the evidence in the light most favorable to the non-moving party, we must determine 'whether there are any genuine issues of material fact and whether the trial court correctly applied relevant substantive law.'"  New Falls Corp. v. Boyajian (In re Boyajian), 367 B.R. 138, 141 (9th Cir. BAP 2007), aff'd, 564 F.3d 1088 (9th Cir. 2009)(quoting Tobin v. San Souci Ltd. P'ship (In re Tobin), 258 B.R. 199, 202 (9th Cir. BAP 2001)).  "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(internal quotation marks omitted).

We also review de novo the preclusive effect of a judgment; whether issue preclusion is available is a mixed question of law and fact.  Stephens v. Bigelow (In re Bigelow), 271 B.R. 178, 183 (9th Cir. BAP 2001).  If issue preclusion is available, the bankruptcy court's decision to apply it is reviewed for abuse of discretion.  Lopez v. Emergency Serv. Restoration, Inc. (In re Lopez), 367 B.R. 99, 104 (9th Cir. BAP 2007).  Under that standard, we reverse where the bankruptcy court applied an incorrect legal rule or where its application of the law to the facts was illogical, implausible or without support in inferences

-10-

that may be drawn from the record.  Ahanchian v. Xenon Pictures, Inc., 624 F.3d 1253, 1258 (9th Cir. 2010), citing United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)(en banc).

"We may affirm 'on any ground supported by the record, regardless of whether the [bankruptcy] court relied upon, rejected, or even considered that ground.'"  Fresno Motors, 771 F.3d at 1125; see also ASARCO, LLC v. Union Pac. R.R. Co., 765 F.3d 999, 1004 (9th Cir. 2014); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

## V.  DISCUSSION

A.   The Nevada Bankruptcy Court Properly Applied Preclusion

Mr. Hebert asserts that the bankruptcy court erred when it gave preclusive effect to the California Judgment.  Mr. Hebert is mistaken.  It is not the California Judgment to which the bankruptcy court gave preclusive effect, but rather the Jagiello Bankruptcy Judgment.  We therefore review whether the bankruptcy court erred when it gave the Jagiello Bankruptcy Judgment preclusive effect.

In Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979), the Supreme Court outlined some potential hazards that could arise if offensive issue preclusion were applied under inappropriate circumstances.  The Supreme Court then concluded that the advantages of avoiding burdensome relitigation on identical issues and promoting judicial economy warranted permitting the use of offensive issue preclusion at the discretion of the trial court: "[T]he preferable approach for dealing with [the tension between issue preclusion's advantages and disadvantages] in the federal courts is not to preclude the use of offensive collateral

-11-

estoppel, but to grant trial courts broad discretion to determine when it should be applied." Id. at 331.

The preclusive effect of a prior federal judgment is determined by federal law. See, e.g., Fed. Deposit Ins. Corp. v. Daily (In re Daily), 47 F.3d 365, 368 (9th Cir. 1995)(applying federal law to determine the preclusive effect of a prior federal judgment in an action under the Racketeer Influenced and Corrupt Organizations Act); Robi v. Five Platters, Inc., 838 F.2d 318, 322 (9th Cir. 1988)(stating that "we apply California law of res judicata to the California judgment, New York law to the New York judgment, and federal law to the federal judgments"); Genel Co. v. Bowen (In re Bowen), 198 B.R. 551, 555 (9th Cir. BAP 1996) (stating that "we apply federal law to determine the preclusive effect of a prior federal diversity judgment"). Issue preclusion applies in dischargeability proceedings. Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991).

Under federal law, issue preclusion may be raised offensively when "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action." IRS v. Palmer (In re Palmer), 207 F.3d 566, 568 (9th Cir. 2000); Pena v. Gardner, 976 F.2d 469, 472 (9th Cir. 1992).

It is not disputed that the Jagiello Bankruptcy Judgment is a final judgment issued by a federal court. The issue in the Jagiello Adversary Proceeding was identical to that raised by

-12-

Ms. Rakich in the Hebert Adversary Proceeding: whether the debt represented by her loan to NOE, guaranteed by Mr. Jagiello and by Mr. Hebert, is nondischargeable pursuant to § 523(a)(2). There is no dispute that the issue of nondischargeability was actually litigated at trial in the Michigan Bankruptcy Court. The only variation in the issue is whether Mr. Hebert's obligation as opposed to Mr. Jagiello's on the debt is nondischargeable. Thus, the determination of whether it was appropriate to give preclusive effect turns on the issue of whether Mr. Hebert was in privity with Mr. Jagiello in connection with the previous litigation.

As noted by the Nevada Bankruptcy Court, the Ninth Circuit has found privity for purposes of preclusion in a variety of contexts, making it a flexible concept.

> (1) where a non-party has succeeded to a party's interest in property; (2) where a non-party controlled the original suit; (3) where the non-party's interests were adequately represented by a party in the original suit; (4) where there is a "substantial identity" between the party and the non-party; (5) where the non-party had a significant interest in and participated in the prior action; (6) where the interests of the non-party and the party are so closely aligned as to be virtually representative; and (7) where there is an express or implied legal relationship by which the parties to the first suit are accountable to non-parties who file a subsequent suit with identical issues.

F.T.C. v. Garvey, 383 F.3d 891, 897 n.5 (9th Cir. 2004), citing U.S. v. Schimmels (In re Schimmels), 127 F.3d 875, 881 (9th Cir. 1997).

The bankruptcy court held that Mr. Hebert was in privity with Mr. Jagiello in connection with the Jagiello Bankruptcy Judgment:

-13-

> There was a substantial identity between [Mr. Hebert] and his cousin, Jagiello, not due to their familial relationship, but because they engaged in "a scheme and artifice to obtain the funds from [Ms. Rakich]." Jagiello Opinion at 14. [Mr. Hebert] also voluntarily appeared as a witness and had a direct interest in the outcome: if Jagiello had convinced Judge Shapero that there was no fraudulent scheme, [Mr. Hebert] could assert issue preclusion as a defense in any future bankruptcy proceeding; if Jagiello failed to convince Judge Shapero, then [Mr. Hebert] could point to his cousin Jagiello as a continuing source of payment of the [California Judgment]. The interests of Jagiello and [Mr. Hebert] were closely aligned and both sought to convince Judge Shapero that their intentions were benign. [Mr. Hebert] was not a party to the Jagiello Adversary but clearly was in privity with Jagiello.

The "substantial identity" between Mr. Jagiello and Mr. Hebert independently supports imputation of Mr. Jagiello's fraud to Mr. Hebert. See Sachan v. Huh (In re Huh), 506 B.R. 257 (9th Cir. BAP 2014)(en banc). Applied to the appeal now before us, Huh stands for the proposition that in order to hold Mr. Hebert liable for the fraud of a business partner, Mr. Jagiello, Ms. Rakich must show that Mr. Hebert knew, or should have known, of Mr. Jagiello's fraud. Here, the record is clear that not only did Mr. Hebert know of Mr. Jagiello's fraud, he orchestrated it. Significantly, in the Jagiello Adversary Proceeding, Mr. Hebert testified that NOE was his brainchild, that the "ventures" he and Mr. Jagiello went into were his call, and that Mr. Jagiello gave him a portion of the money from Ms. Rakich because Mr. Hebert told him to. "I'm the guy who's going to make decisions based on what I think and where we're going to raise the money and where we're going to make profits and where we're not going to make profits." Under Huh, Mr. Jagiello's fraud as found by the Michigan Bankruptcy Court can be imputed to Mr. Hebert.

-14-

The Nevada Bankruptcy Court correctly identified the law in determining whether preclusion was available with respect to the SJ Motion based on the Jagiello Adversary Judgment. Further, we cannot say that the Nevada Bankruptcy Court's application of the law to the facts was illogical, implausible or without support in inferences that may be drawn from the record. This is particularly true where, as noted by the Nevada Bankruptcy Court, Mr. Hebert never suggested in any declarations that his testimony in a trial in the Nevada Bankruptcy Court would be different in any way from his testimony under oath in the Michigan Bankruptcy Court.

We now review de novo whether the SJ Motion was appropriately granted based upon the Jagiello Bankruptcy Judgment.

B.    Summary Judgment Purpose and Standards.

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. Nw. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994). Genuine issues of material fact are those "factual issues that make a difference to the potential outcome and 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Svob v. Bryan (In re Bryan), 261 B.R. 240, 243 (9th Cir. BAP 2001)(internal citation omitted). Once the moving party's burden is met by presenting evidence which, if uncontroverted, would entitle the moving party to a directed verdict at trial, the burden then shifts to the respondent to produce "significantly probative evidence" of specific facts

showing there is a genuine issue of material fact requiring a trial. T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 627, 630 (9th Cir. 1987), citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968). The respondent will not be able to withstand a motion for summary judgment merely by making allegations, but must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial. A mere "scintilla" of evidence supporting the respondent's position will not be sufficient. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In deciding whether a fact issue has been created, the court must view the facts and the inferences to be drawn therefrom in a light most favorable to the nonmoving party. See Jonas v. Resolution Trust Corp. (In re Comark), 971 F.2d 322, 324 (9th Cir. 1992). All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. Anderson, 477 U.S. at 248. Inferences may also be drawn from underlying facts that are not in dispute. T.W. Elec. Serv., 809 F.2d at 631.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

To establish nondischargeability as a result of fraud under § 523(a)(2)(A), courts in the Ninth Circuit employ the following five-part test: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or

-16-

deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 (9th Cir. 2001).

The Nevada Bankruptcy Court carefully reviewed the findings made in support of the Jagiello Bankruptcy Judgment and determined that they satisfied every element to establish a § 523(a)(2)(A) claim. We reach the same result in our independent review.

The findings which support the first three elements of a claim based upon fraudulent representations, are set forth in the factual discussion above. Distilled to their essence they are:

- The formation of NOE was window dressing which Mr. Hebert never intended would have any substance or role or that it would operate or carry out the purpose(s) of the NOE Agreement.

- At the time the NOE Agreement was entered, Mr. Hebert knew that the Long Beach Project's estimated costs had increased to the point of being prohibitive.

- Mr. Hebert never told Ms. Rakich that the Long Beach Project would not be pursued.

- Notwithstanding his inability to comply with the NOE Agreement, Mr. Hebert went forward with the transaction pursuant to which Ms. Rakich was divested of $280,000.

- The foregoing constituted a scheme or artifice to obtain Ms. Rakich's funds for use by Mr. Hebert and Mr. Jagiello personally.

With respect to the element of justifiable reliance, the Michigan Bankruptcy Court found that Ms. Rakich had been "put under pressure [by Mr. Jagiello and Mr. Hebert] to produce the

-17-

funds in a very short . . . time frame," and to enter into the NOE Agreement, drafted by Mr. Hebert's attorney, "in a time frame and under circumstances in which she at least felt precluded her from obtaining her own attorney." These actions created a situation which "put a premium on [Ms. Rakich's] trust of [Mr. Hebert]" based upon their personal relationship, "a trust which [Mr. Hebert] took undue advantage of at the time the [NOE] Agreement was discussed and signed."

As pointed out by the Nevada Bankruptcy Court, in his supplemental declaration in opposition to the SJ Motion, Mr. Hebert stated that after the California Judgment was entered Ms. Rakich emailed him for business advice, a "fact" which he asserts evidences that Ms. Rakich "was not swindled out of any money." However, the email was introduced into evidence at the Michigan trial and therefore was considered by the Michigan Bankruptcy Court when it ruled. Notwithstanding this evidence, the Michigan Bankruptcy Court reached the conclusion that Ms. Rakich in fact had been "swindled."

Finally, with respect to the final element required to establish a § 523(a)(2)(A) claim, the Michigan Bankruptcy Court found that based on the discussions relating to the NOE Agreement, Ms. Rakich loaned $280,000 to NOE, making those representations the proximate cause of her loss of the funds.

Based on the foregoing, summary judgment on Ms. Rakich's § 523(a)(2)(A) claim against Mr. Hebert was properly granted.

The Summary Judgment determined only that the debt Mr. Hebert owed to Ms. Rakich is nondischargeable. That the debt currently is in the form of the default California Judgment on

claims other than fraud does not render such a finding erroneous.

## VI. CONCLUSION

The Nevada Bankruptcy Court correctly identified the law regarding the preclusive effect of the Jagiello Bankruptcy Judgment. It did not abuse its discretion when it applied preclusion to the SJ Motion. Both the Nevada Bankruptcy Court and this Panel in its de novo review have determined that the factual findings and conclusions of law which support the Jagiello Bankruptcy Judgment establish all of the elements to support summary judgment in favor of Ms. Rakich on her § 523(a)(2)(A) claim against Mr. Hebert.

We AFFIRM.

-19-