Diane MANN, as Trustee for the Estate of LeapSource, Inc., et al., Plaintiffs,

v.

GTCR GOLDER RAUNER, L.L.C., a Delaware limited liability company, et al., Defendants.

No. CIV–02–2099–PHX–RCB.

United States District Court, D. Arizona.

March 30, 2007.

Kevin Breger, The Law Offices of Kevin Breger, Leo R. Beus, Scot C. Stirling, Steven Eric Weinberger, Beus Gilbert PLLC, Scottsdale, AZ, Steven Joseph Brown, Steve Brown & Associates LLC, Phoenix, AZ, for Plaintiffs.

Merrick Brian Firestone, Veronica Lynn Manolio, Ronan & Firestone PLC, Scottsdale, AZ, David S. Foster, Kevin Russell, Livia M. Kiser, Michael J. Faris, Nicholas

Benjamin Gorga, Latham & Watkins LLP, Chicago, IL, Don P. Martin, Edward Alipio Salanga, Quarles & Brady LLP, Daniel P. Jensen, Law Office of Daniel P. Jensen PLLC, James R. Condo, John J. Bouma, Joseph G. Adams, Patricia Lee Refo, Todd Feltus, Snell & Wilmer LLP, Phoenix, AZ, for Defendants.

### ORDER

BROOMFIELD, Senior District Judge.

### *Introduction* [1]

Defendant Michael Makings had an integral role in LeapSource, Inc., a now defunct business process outsourcing company. In late 2000, he assumed the responsibilities of LeapSource's Chief Operating Officer ("COO"). DSOF (doc. 341), exh. 20 thereto at 83. For a short time, beginning on February 27, 2001, until roughly mid-March, 2001, Mr. Makings was Chief Executive Officer ("CEO") and a director of LeapSource. Doc. 324 at ¶ 5 (citation omitted). In addition to his involvement with LeapSource, as detailed in *Mann v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 708 (D.Ariz.2006), Mr. Makings has been involved in several capacities with ICG Group, Inc. Primarily because of LeapSource's sale of its ICG division to Mr. Makings in late March 2001, he was named as a defendant in this action. Defendant Makings was "at all times ICG Group's sole shareholder and sole director." *Id.* at 709 (citations omitted).

Before the court are motions directed at nine counts of the Fourth Amended Complaint ("FAC") (doc. 21) against defendant Makings. Five of those counts are being brought by the plaintiff bankruptcy trustee, Diane Mann. The other four are being brought by the individual plaintiffs, all for-

mer LeapSource shareholders and employees.[2]

Currently pending before the court is defendant Makings' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (doc. 340). Having carefully considered that motion, plaintiffs' response (doc. 418), and defendant's reply (doc. 447), and having determined that oral argument is unnecessary, the court rules as follows.

### *Discussion*

### I. *Standard of Review*

The court assumes familiarity with what has sometimes been referred to as the *Celotex* trilogy wherein the Supreme Court, in 1986, clarified and refined the standards for deciding Rule 56 summary judgment motions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no need to repeat the entire body of summary judgment case law which has developed since then, but a few principles are worth highlighting.

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is beyond dispute that "[t]he moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact." *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir.2007) (citation omitted). "Once the moving party meets

---

1. The court assumes familiarity with this protracted litigation, including all prior proceedings and decisions herein.

2. Hereinafter, all references to plaintiffs in the plural form shall be read as referring to the individuals, as opposed to the trustee.

its initial burden, ..., the burden shifts to the nonmoving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citations omitted). This "[e]vidence must be concrete and cannot rely on 'mere speculation, conjecture, or fantasy.'" *Bates v. Clark County,* 2006 WL 3308214, at * 2 (D.Nev. Nov.13, 2006) (quoting *O.S.C. Corp. v. Apple Computer, Inc.,* 792 F.2d 1464, 1467 (9th Cir.1986)). Similarly, uncorroborated and self-serving testimony or declarations, without more, will not create a genuine issue of material fact precluding summary judgment. *See DuBois v. Ass'n Apart. Owners 2987 Kalakaua,* 453 F.3d 1175, 1180 (9th Cir.2006), *cert. denied,* 2007 WL 506192, 75 USLW 3436 (Feb. 20, 2007).

Nor will "a mere 'scintilla' of evidence" be sufficient "to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco,* 125 F.3d 1328, 1331 (9th Cir.1997) (quoting *Anderson,* 477 U.S. at 249, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202). Thus, in opposing a summary judgment motion it is not enough to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted).

By the same token though, when assessing the record to determine whether there is a "genuine issue for trial," the court must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inference in his favor." *Horphag,* 475 F.3d at 1035 (citation omitted). The court may not make credibility determinations; nor may it weigh conflicting evidence. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. With these standards firmly in mind that the court has examined, at length, the present record, and the parties' respective arguments.

## II. Tortious Interference with Contract Counts

### A. Count 1—Purchase Agreement

The plaintiff trustee designates count one of the FAC, "Tortious [sic] Interference with Contract Against: Makings, Eaton, AEG and K & E[.]"[3] FAC (doc. 121) at 74. The "contract" which forms the basis for this count is the Purchase Agreement between the GTCR VI Entities[4] and LeapSource. Although the designation explicitly names defendant Makings, his name is conspicuously absent from any substantive allegations in count one.

In any event, defendant Makings advances three arguments as to why the court should grant summary judgment in his favor on this count. First, Makings notes that there "are *no allegations* in the *FAC* that [he] acted in ... a capacity other than as an officer or director of LeapSource[ ]" with respect to the Purchase Agreement. Mot. (doc. 340) at 2 (emphasis added). Second, Makings accurately points out that this court has previously held that there was no breach of the Purchase Agreement when the GTCR Entities decided to stop funding LeapSource. *See* Order (D.Ariz. Sept. 30, 2003) (doc. 72) at

---

**3.** Mr. Makings is the only remaining defendant in this count because Mr. Eaton and AEG entered into settlement agreements dismissing all claims as against them with prejudice, and judgment was entered in their favor on September 8, 2006 (doc. 461). Furthermore, the court previously granted a motion for summary judgment in favor of the law firm Kirkland & Ellis ("K & E") on this count and others.

**4.** The GTCR VI Entities are comprised of the three defendant private equity funds, GTCR Fund VI, L.P., GTCR VI Executive Fund and GTCR Associates VI.

5–11; and 32. Thus, Makings reasons, the law of the case doctrine mandates summary judgment because absent a breach, there can be no tortious interference with contract as a matter of law. Third, according to Makings, plaintiffs cannot establish that he had knowledge of the Purchase Agreement—an essential element of a tortious interference with contract cause of action.

Plaintiffs' response overlooks the law of the case argument, and instead focuses on the capacity in which defendant Makings is being sued. In essence plaintiffs counter that Makings is trying to "have his cake and eat it too." Plaintiffs assert that at other times in this litigation, Makings has taken the position that "he was *not* an officer or director of LeapSource when he purchased the ICG asset from Leap-Source[.]" Resp. (doc. 418) at 5. Now, plaintiffs believe that Makings is claiming he was a LeapSource officer or director. This "contradiction," as plaintiffs describe it, shows that there are disputed facts rendering summary judgment improper. *See id.* What is more, plaintiffs maintain that "there are allegations and ... evidence that Makings was acting purely for his personal benefit and not as an officer or director of LeapSource." *Id.*[5]

Then, as they did in opposing the GTCR defendants' summary judgment motion, plaintiffs assert that a breach of contract is not a prerequisite to maintaining a cause of action for tortious interference with contract. "[I]t is enough," in plaintiffs' opinion, "if the Agreement was terminated, even without a breach[.]" *Id.* at 6. Here, plaintiffs contend that that "termin[ation]" took the form of GTCR's decision to cease funding under the Purchase Agreement.

### 1. Law of the Case Doctrine

Earlier in this litigation the court granted, *inter alia*, the GTCR defendants' Rule 12 motion to dismiss count two of the First Amended Complaint.[6] *See* Doc. 72 at 5–11. Among other things, count two alleged that the GTCR Entities breached the Purchase Agreement by "failing to fully fund LeapSource" under the terms of that Agreement. *See id.* at 5 (internal quotation marks and citation omitted). The court held that there was no breach of the Purchase Agreement because the "language [wa]s perfectly clear that it imposed a conditional funding obligation on GTCR." *Id.* at 11. In fact, the court explicitly found that "[t]he allegation to this effect [*i.e.* an obligation to fully fund Leap-Source] [wa]s simply erroneous[.]" *Id.* at 6–7.

That prior order also granted the GTCR defendants' motion to dismiss the related claim for tortious interference with Purchase Agreement.[7] *See id.* at 31–33; and 69. In dismissing that count, at the outset this court stressed that "[o]f primary importance to the resolution" of whether plaintiffs stated such a claim was "the fact that the court has already ruled that no breach of the Purchase Agreement occurred[.]" *Id.* at 32 (citation omitted).

---

5. To support this contention plaintiffs cite only to the FAC and not to any record evidence. This is a significant oversight given the procedural posture of this case. At this summary judgment stage, plaintiffs cannot rely upon mere conclusory allegations in the complaint. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) ("[A] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.")

6. Defendant Making's motion to dismiss this count and others was the subject of a separate order. *See* Doc. 70.

7. That count is nearly identical to count one of the FAC, which is the subject of this motion, except that in its earlier form plaintiffs named a broader range of defendants.

The court continued in a similar vein, noting that as it "ha[d] fully explained in its Order related to [K & E's] Motion to Dismiss, an *actual breach* of the *underlying contract* is a prerequisite to liability for tortious interference." *Id.* (emphasis added). Then, after listing the elements of tortious interference with contract, the court reiterated that "a breach of the underlying agreement *must occur* in order to find liability for tortious interference." *Id.* (emphasis added). In fact, "[b]ecause the court ha[d] held ... that this preliminary requirement [breach of the underlying agreement] [wa]s not met," it found no "need to discuss the other" bases for dismissal urged by the GTCR defendants. *Id.*

In another order issued that same day, the court likewise granted K & E's motion to dismiss the tortious interference with Purchase Agreement count. Employing the same reasoning as it did in the GTCR defendants' dismissal motion, the court held that "a claim for tortious interference with the Purchase Agreement [could] not stand[ ]" because "the Purchase Agreement was not breached[.]" Doc. 69 at 23.

■ Reasoning that it is now the law of the case that there was no breach of the Purchase Agreement, defendant Makings contends that he is entitled to summary judgment on the claim that he tortiously interfered with that Agreement. "Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'" *Sathianathan v. Smith Barney, Inc.,* 2004 WL 3607403, at *3 (N.D.Cal. May 28, 2004) (quoting, *inter alia,* 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure,* § 4478). "Under the 'law of the case' doctrine, a court is ordinarily precluded from

reexamining an issue previously decided by the *same court,* or a higher court, in the *same case.*" *Hydrick v. Hunter,* 466 F.3d 676, 687 (9th Cir.2006) (internal quotation marks and citation omitted) (emphasis added). "For the law of the case doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition." *Id.* (internal quotation marks and citations omitted). This doctrine "of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

■ In the present case, this court has explicitly held that there was no breach of the Purchase Agreement when the GTCR Entities decided to discontinue funding LeapSource. Moreover, not once but twice before, this court has also explicitly held that without a breach of that underlying Agreement, a claim of tortious interference with that Agreement cannot be sustained. In light of those prior rulings, the issue of the underlying breach, as well as the issue of requiring a breach as a predicate to liability for tortious interference with contract are not open to relitigation. The court hastens to add that none of the reasons for deviating from the law of the case doctrine apply here. *See Minidoka Irrigation Dist. v. Department of Interior of U.S.,* 406 F.3d 567, 573 (9th Cir.2005) (internal quotation marks and citation omitted) ("The law of the case doctrine is subject to three exceptions that may arise when (1) the decision is clearly erroneous and its enforcement would mark a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.") [8] Consequently, the court finds that

---

8. Given this court's prior rulings that a breach of contract is necessary to prevail on a

the law of the case doctrine dictates granting defendants Makings' summary judgment motion as to count one of the FAC, alleging tortious interference with the Purchase Agreement. Because the law of the case doctrine is determinative, there is no need to consider defendant Making's alternative arguments, *i.e.* the capacity in which he was sued and whether he had knowledge of the Purchase Agreement.

### B. Count 21—Senior Management Agreements and Employment Agreements

The thrust of count 21 is that allegedly defendant Makings, along with other defendants, tortiously interfered with the Senior Management Agreements and the Employment Agreements[9] which the individual plaintiffs had with LeapSource. Due to that alleged interference, plaintiffs claim that they did not receive the severance payments ("and in some cases other ... mon[ies]") to which they believe they were entitled under those contracts. Resp. (doc. 418) at 11.

tortious interference with contract claim, it is possible to read plaintiff's contrary assertion, *i.e.* "[t]he law does not require a *breach* [,]" as urging a departure from the law of the case. Plaintiff has not provided a sufficient basis warranting such a departure however; nor has she expressly urged such a departure.

To support her argument, plaintiff relies upon three cases (two outside of this jurisdiction) involving the termination of at-will employees. *See Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 909 P.2d 486 (Ariz.Ct.App.1995); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989); and *Cronk v. Intermountain Rural Electric Ass'n*, 765 P.2d 619 (Colo.Ct.App. 1988). Plaintiff's reliance upon these employment cases is misplaced from both a legal and factual standpoint. Factually, there is a clear difference between at-will employee relationships, with no written contracts, and a written Purchase Agreement such as the one which has been the subject of this litigation.

Several times over the course of this litigation, the court has enumerated the elements which are necessary to establish intentional interference with a contract under Arizona law. Most recently this court indicated:

The tort of intentional interference with contractual relations requires a plaintiff to prove: (1) existence of a valid contractual relationship,(2) knowledge of the relationship on the part of the interferor,(3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5)that the defendant acted improperly.

*Mann*, 351 B.R. at 701 (quoting *Safeway Insurance Company, Inc. v. Guerrero*, 210 Ariz. 5, 106 P.3d 1020, 1025 (2005)) (other citation omitted).

As to the third element, the interference must be " '*both* intentional and improper.' " *Safeway*, 106 P.3d at 1026 (quoting Restatement (Second) of Torts § 767 cmt. a (1979)). Thus, "[i]f the interferer is to be held liable for committing a wrong, his liability must be based on more

There is also a significant legal distinction between each of those at-will employee cases and this action. In sharp contrast to the present case, in each of the cited cases there was a *breach* of the at-will employee relationship. As the discussion above makes clear, plaintiff has not, and indeed cannot, show a similar breach here. Hence, to the extent plaintiff is implying that the court should revisit the issue of whether the Purchase Agreement was breached, and thus in turn, whether such a breach is necessary to state a claim for tortious interference with contract, the court declines to do so.

9. Hereinafter in this section "employment contracts" shall be read as referring to these Agreements as well as to the Senior Management Agreements, because there is no need to distinguish between the two for the present motion.

than the act of interference alone." *Id.* (internal quotation marks and citation omitted). As the Arizona Supreme Court explained in *Snow v. Western Savings & Loan Association,* 152 Ariz. 27, 730 P.2d 204 (1987), "[t]he tort is intentional in the sense that [defendant] must have intended to interfere with the [plaintiffs'] contract or have known that this result was substantially certain to be produced by its conduct." *Id.* at 33, 730 P.2d at 211 (citations omitted). Consequently, Arizona case law "emphasizes that a plaintiff must show more than the defendant's knowledge that his or her conduct would induce a breach to establish intentional interference with contractual relations." *Safeway,* 106 P.3d at 1026 (citing cases).

▮▮▮ Improper conduct, the fifth element, is analyzed by considering the following seven factors previously recited by this court:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action· of the actor and the contractual interests ·of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Mann,* 351 B.R. at 700–701 (quoting Restatement (Second) of Torts § 767 (1979)) (other citations omitted). "If the plaintiff is unable to show the impropriety of the defendant's conduct based on an examination of these factors, the conduct is not tortious." *Id.* at 701 (citation omitted). Of these seven factors, the two "deserving the most weight are the nature of the actor's conduct and the actor's motive." *Wells Fargo Bank v. Arizona Laborers, Teamsters· and Cement Masons Local No. 395 Pension Trust,* 201 Ariz. 474, 494, 38 P.3d 12, 32 (2002) (citation omitted).

Initially Makings took the position that because the plaintiffs were "at-will" employees, he could not be held liable for tortiously interfering with their employment contracts when, as LeapSource CEO, he signed their termination letters. This argument was quickly laid to rest, however, by plaintiffs' opposition emphasizing that they are not asserting any form of " 'wrongful termination[.]' " *See* Resp. (doc. 418) at 11. Once again, plaintiffs' theory of liability comes back to their fervent belief that the ICG asset sale to defendant Makings was fraudulent and constitutes a breach of fiduciary duties. This purported breach of fiduciary duties, from plaintiffs' standpoint, supports a claim for tortious interference with contract. In any event, the alleged tortious interference is not plaintiffs' termination from LeapSource, but rather the ICG asset sale.

Viewed through this lens, Makings argues that summary judgment in his favor on count 21 is mandated because the plaintiffs cannot show either that he acted with the requisite intent, or that he "improperly interfere[d] with" their employment contracts. *See* Mot. (doc. 340) at 11. The court agrees. It does so for the simple reason that, as will be more fully discussed below, plaintiffs have not met their burden of proof with respect to either of these elements. Nor, for that matter, as will also be more fully discussed below, have plaintiffs met their burden of proof with respect to the knowledge element of this tortious interference claim.

Plaintiffs assert that Makings "knew" that they were entitled to severance payments "and in some cases other amounts of money[ ]" under the terms of their employment contracts. *See* Resp. (doc. 418) at 11. According to plaintiffs, Makings gained that knowledge "because he was personally involved in attempts to negotiate reductions in those [contractual] obligations." *Id.* The noticeable absence of

cites to the record is fatal to plaintiffs' opposition. Plaintiffs cannot defeat this summary judgment motion by relying upon blanket, unsupported assertions or declarations in their opposing memorandum of law. *See Smith v. Mack Trucks,* 505 F.2d 1248, 1249 (9th Cir.1974) (citation omitted) ("[A][l] egal memorand[um] ..., in the summary-judgment context, [is] not evidence, and do[es] not create issues of fact capable of defeating an otherwise valid motion for summary judgment.") That is so in part because "the arguments and statements of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment." *Barcamerica Intern. v. Tyfield Importers, Inc.,* 289 F.3d 589, 593 n. 4 (9th Cir.2002) (internal quotation marks and citation omitted).

■ Plaintiffs' opposition is equally unavailing in terms of the intent element. Plaintiffs accurately state, as noted earlier, that one way in which to establish intent here is to show that a defendant *"kn[ew] that this result was substantially certain to be produced by [his] conduct."* *See* Resp. (doc. 418) at 10 (quoting *Snow,* 730 P.2d at 211) (other citation omitted) (emphasis added by plaintiffs). Applying that rule to the present case would require plaintiffs to show that defendant Makings knew that the ICG asset sale was "substantially certain" to "result" in their not receiving whatever severance and other monies they believe they are owed under the employment contracts. Plaintiffs baldly assert that "the evidence is overwhelming that [improper] interference with the performance of [the] [employment] contract obligations was certain to be the result of conveying" the ICG asset to Makings. *Id.* at 10. To defeat a summary judgment motion, it is not enough to merely state that "the evidence is overwhelm-

ing[.]" *See id.* Nor is it enough to say, as plaintiffs also do, that "[t]he question of intent ordinarily is for the finder of fact." *Id.* (quoting *Snow,* 730 P.2d at 212) (other citation omitted).

Plaintiffs must demonstrate how that evidence is "overwhelming." At the very least, as the party opposing summary judgment, plaintiffs must "designate *specific facts* showing that there is a genuine issue for trial." *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (internal quotation marks omitted) (emphasis added) Further, they must point to the evidence from which a jury could find, or reasonably infer, the requisite intent. Plaintiffs have not done that however.

Plaintiffs did quote from the deposition of one of the plaintiffs, Patrice Walker, wherein she testified about a breakfast meeting she had with defendant Makings in early January, 2001. When directly asked whether "Mr. Makings ever specifically sa[id] anything about the company [LeapSource], quote, unquote, going under[,]" plaintiff Walker responded: "He said there were significant changes going on at LeapSource because of the increased pressure from GTCR." Resp. (doc. 418) at 12–13 (quoting Walker Deposition).[10] Following up on that answer, Ms. Walker was then asked whether Makings said "anything else on that issue[.]" *Id.* at 13 (citation omitted). She replied, "All he [Makings] wanted to do was walk away with ICG." *Id.* (citation omitted). Pointedly asked whether Makings "specifically sa[id] that[,]" Walker readily agreed, "He specifically said that." *Id.* (citation omitted).

Plaintiffs' reliance upon the foregoing is problematic. Plaintiffs have not explained (and it is not readily apparent) how this testimony bears on the issue of whether Makings knew that if he bought ICG, the

---

10. Plaintiffs did not cite to where, if at all, this excerpt can be found in the record.

Thus, the court is unable to provide a complete citation.

plaintiffs would not receive severance payments pursuant to their employment contracts. Therefore, as with the knowledge component of tortious interference with contract, plaintiffs have not shown a genuine issue of material fact so as to preclude summary judgment on this count.

Turning to the fifth element, improper conduct, plaintiffs accurately state the law, listing the seven Restatement factors which must be examined in resolving that issue. Resolution of this issue, plaintiffs maintain, "requires a factual determination that cannot be made in the context of this motion for summary judgment[.]" Resp. (doc. 418) at 9. Denial of this aspect of Makings' motion is mandated, plaintiffs suggest, because "there is more than enough evidence to support a jury verdict that, ..., the sale of the ICG assets was harmful to the interests of the creditors of LeapSource, and prevented LeapSource from performing its contract obligations to creditors, including to ... Plaintiffs who were owed substantial severance payments by LeapSource." *Id.*

Again, the deficiency in plaintiffs' response is their failure to cite to relevant record evidence. As the Ninth Circuit permits, this court has "limit[ed] its review to the documents submitted for purposes of summary judgment and *those parts of the record specifically referenced therein.*" *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir.2001) (emphasis added). Here, plaintiffs "specifically referenced" a few selected quotes, some of which are set forth above, from the deposition of plaintiff Walker. However, the fact that defendant Makings purportedly "wanted to walk away with ICG[ ]" does not create a genuine issue of material fact as to "improper conduct." *See* Doc. 418 at 13 (citation omitted).

The remainder of Walker's deposition testimony from which plaintiffs quote does not advance their argument that Makings engaged in improper conduct of the type which is necessary to support tortious interference with contract. To illustrate, Ms. Walker testified that Makings asked her if she had "ever considered ICG[.]" *Id.* at 12 (citation omitted). As Walker recalls it, Makings then asked her what she would "do personally if these changes occurred at LeapSource[.]" *Id.* (citation omitted). And Makings wondered if she "could ... take his cell phone [number] if [she] wanted to discuss this in the future." *Id.* (citation omitted). The court is at a loss to see how this testimony creates a factual issue as to Makings' supposed improper conduct. If plaintiffs had analyzed, with cites to relevant record evidence, "the nature of [Making's] conduct and [his] motive" (the two factors "deserving the most weight[ ]" in deciding whether conduct is improper), *Wells Fargo*, 38 P.3d at 32 (citation omitted), perhaps the court could have overlooked their lack of discussion as to the other six Restatement factors which are germane to improper conduct inquiry, but the court cannot. Plaintiffs do "not have enough evidence of" not just one but three "essential elements" of this tortious interference with contract claim "to carry [their] ultimate burden of persuasion[.]" *See Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir.2000). Therefore, summary judgment in favor of defendant Makings as to count 21 is proper.

### C. Count 23—Stockholders Agreement and Purchase Agreement

In count 23 of the FAC, the plaintiffs alleged that defendant Makings and other defendants "intentionally caused the GTCR VI Entities to breach the Stockholders Agreement and the Purchase Agreement[.]" FAC (doc. 121) at 103, ¶ 485. To the extent plaintiffs are alleging that defendant Makings tortiously interfered with the Purchase Agreement, for the reasons set forth in section II(A)

above, the court grants defendant's motion for summary judgment.

In moving for summary judgment on count 23, defendant Makings focused solely on the Purchase Agreement. As the moving party, Makings had the burden of "either produc[ing] evidence negating an essential element of" this claim as it pertains to the Stockholders Agreement, or "show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *See Nissan Fire & Marine*, 210 F.3d at 1102. Defendant Makings did neither. Accordingly, the court denies defendant Making's summary judgment as to count 23 to the extent the Stockholders Agreement is a basis for that count.

### III. Breach of Fiduciary Duty Counts

Defendant Makings also is moving for summary judgment on the breach of fiduciary duty counts, both those brought by the trustee and those brought by the individual plaintiffs. Primarily because there is a significant standing issue with respect to the individual plaintiffs, the court will separately analyze these breach of fiduciary duty counts.

#### A. Count 5—"Breach of Fiduciary Duties by Directors and Officers"

In count 5 the trustee alleges that defendant Makings, along with other defendants, breached a wide range of fiduciary duties. From the extensive discovery, defendant Makings surmises that he allegedly breached those duties in three different ways.[11] In opposing this aspect of defendant Making's motion, however, the trustee focuses upon the ICG assets sale to the exclusion of other possible bases for a breach of fiduciary. The court will similarly limit its analysis.

A prior ruling in the consolidated adversary proceeding further limits the scope of count five *vis-a-vis* the present motion. When the trustee filed her opposition to the present motion, her summary judgment motion as to count III, alleging a preferential transfer in violation of 11 U.S.C. § 547, was still pending in the adversary proceeding. However, in an August 28, 2006, decision, the court found that defendant Makings was not an "insider" within the meaning of that statute. *See Mann*, 351 B.R. at 704. Accordingly, the court denied the trustee's motion for summary judgment as to count III.[12]

That prior ruling directly impacts the present motion because the trustee asserts that "[a]s a matter of law, the *same conduct* that [was] described in [her] Motion for Summary Judgment Re Count III (fraudulent transfer and preferential transfer of the assets of an insolvent company[13]) constitutes a breach of fiduciary duty to LeapSource[.]"[14] Resp. (doc. 418)

---

11. The first way is through "discussions [Makings] was allegedly having with the GTCR Defendants[.]" Mot. (doc. 340) at 18. Second, Makings allegedly breached his fiduciary duties by "developing cost projections and reduction in work force[.]" *Id.* The third alleged breach arises out of the ICG asset sale to ICG Group.

12. As a result, all three counts are still pending in the adversary proceeding: (1) fraudulent transfer pursuant to 11 U.S.C. § 548 against defendants ICG Group, Inc. and Mak-

ings; (2) aiding and abetting a fraudulent transfer against defendant Makings; and (3) preferential transfer against ICG Group, Inc. and Makings.

13. The trustee is mistaken. That motion did *not* pertain to the fraudulent conveyance count. The trustee moved for summary judgment *only* as to count III, alleging a preferential transfer. *See Mann*, 351 B.R. at 709 (citing doc. 312).

14. Given the court's holding in the GTCR defendants' related summary judgment mo-

at 14 (footnote and emphasis added). The conduct which the trustee identified in that motion, and which she incorporated by reference herein, is her belief that Makings had "inside information that [LeapSource] was failing and on its way to bankruptcy[.]" Mot. (doc. 374) at 2. As further support for her view that Makings was an "insider," the trustee pointed out that he "negotiated for payment of his own debt[,]" that is the $2.5 million note; he then resigned as the CEO and a director of LeapSource. *See id.* From the trustee's perspective, adding to Makings' purported status as an "insider" is that days after his resignation, the ICG asset was transferred to him. *See id.*

 To the extent the trustee contends that Makings breached his fiduciary duties because he engaged in a preferential transfer in violation of section 547, the law of the case doctrine, discussed herein, forecloses this argument. The trustee therefore is left with her argument that defendant Makings engaged in a fraudulent transfer in violation of 548 of the Bankruptcy Code, which in turn results in a breach of fiduciary duty.

 With this clarification, the court next considers defendant's argument that summary judgment is proper as to count 5 because he did not owe any fiduciary duties to LeapSource on the date of the ICG assets sale. Makings asserts that he did not owe any fiduciary duties to Leap-Source at that time because he had resigned as LeapSource's CEO and as one of its directors before the sale date. Defendant Makings correctly acknowledges that Delaware law applies to this fiduciary duty claim. *See* Mot. (doc. 340) at 18. Despite that, he then incongruously relies upon Arizona law to argue that he did not owe

any fiduciary duties when the ICG assets sale occurred. *See id.* at 19 (citing *Master Records, Inc. v. Backman*, 133 Ariz. 494, 652 P.2d 1017 (1982)). *Master Records* applies Arizona law, and thus is *not* controlling on the issue of whether under Delaware law defendant Makings owed a fiduciary duty to LeapSource at the time of the ICG asset sale. This is a significant omission. It was incumbent upon defendant Makings to support his argument with the applicable law, *i.e.* Delaware. That he did not do. Therefore, the court denies Makings' summary judgment motion insofar as he grounds it on the theory that as a matter of law he did not owe a duty to LeapSource when the ICG asset sale occurred.

Shifting to the time frame prior to the ICG assets sale, Makings readily concedes that he was a LeapSource employee and director while at least some of the negotiations for that sale took place. Nonetheless, Makings contends that, as a matter of law, he cannot be held liable for breach of fiduciary duties during that time because he was entitled to engage in what he terms "mere preparations" to compete with LeapSource. *See* Mot. (doc. 340–2) at 22. Makings believes that he was entitled to engage in those "preparations" (which he does not identify or explain) even though he was still an employee and director of LeapSource.

Defendant Makings provides no legal argument to support his position. Instead, he cites to a string of five cases from jurisdictions as varied as the Tennessee Court of Appeals to the Kansas Supreme Court. In fact, even though it is undisputed that Delaware law governs this breach of fiduciary duty count, only one of the five

tion that the individual plaintiffs lack standing to pursue their separate breach of fiduciary duty claims against defendant Makings, there is no need to address the issue of whether, as

they contend, Makings owed a separate fiduciary duty to the individual plaintiffs as Leap-Source creditors.

cases to which Makings cites even mentions Delaware law, and then just in passing. *See Bancroft–Whitney Co. v. Glen,* 64 Cal.2d 327, 345, 49 Cal.Rptr. 825, 411 P.2d 921 (Cal.1966) (quoting from a 1939 Delaware case as to the "general rules applicable to the duties of a corporate officer[ ]"). What is more, *Bancroft–Whitney,* like the other cases to which Makings cites, is readily distinguishable on its facts. There, the defendant, while still employed by the plaintiff company, provided company information to a competitor, thus enabling that competitor to enter into employment contracts with plaintiff's co-workers. Clearly there are no such allegations in the present case.

Finally, defendant Makings' reliance upon *Bancroft–Whitney* is all the more curious because in that case the court expressly held that "as a matter of law" the defendant' did not breach his fiduciary duties given that his conduct fell "demonstrably short of the most scrupulous observance of an officer's duty to his corporation." *Bancroft–Whitney,* 49 Cal.Rptr. 825, 411 P.2d at 936 and 937. In sum, because none of the cases to which defendant Makings cites are binding on this court, once again, Makings has not met his burden in terms of showing that as a matter of law, he did not breach any fiduciary duties when he engaged in "preparations" for the ICG assets sale prior to resigning from LeapSource.

Even in the face of these weaknesses, defendant Makings persists in arguing that summary judgment is warranted as to this breach of fiduciary duty count. That is so, Makings asserts, because the testimony of Ms. Matiski, whom he portrays as "an expert in the area of officer fiduciary duties (and the attorney that LeapSource relied on for these issues)[,] ... effectively ends Plaintiffs' claims that [he] breached his fiduciary duties." Mot. (doc. 340-2) at 23. In this regard, defendant Makings

offers the following excerpt from Ms. Matiski's deposition:

Q. Are you familiar with the fiduciary responsibilities that officers owe to companies such as LeapSource?

A. Yes.

Q. And that is a field you have been practicing in for approximately 25 years?

A. 25 years, thank you.

Q. After observing Mr. Makings' conduct during the time he was COO and CEO, did you observe any breaches of fiduciary duties?

A. No.

*Id.* (quoting SOF 96).

This snippet of deposition testimony is not dispositive of the fiduciary duty issues which this motion raises though. The trustee has countered with additional testimony by Ms. Matiski showing that this opinion is not as unequivocal as it might appear at first glance. As to possible breaches of fiduciary duties, later in her deposition Ms. Matiski testified:

Q. Did you provide any advice to Chris Kirk as to whether Mike Makings had breached his fiduciary duties to LeapSource?

A. I don't remember. The context was GTCR is a member—... of the board of directors ... of this company through its representatives. They have fiduciary obligations. They are refusing to fund. That is a breach of their fiduciary obligations. That is the kind of research we were doing. That is not a breach of fiduciary obligations. I don't ... believe—I don't think—no, we were not—I was not thinking about Mike Makings in that context, *and we didn't do an independent review of his actions.*

PSOF (doc. 419) at 50 (emphasis added by plaintiffs). It is possible to read the foregoing as meaning that Ms. Matiski's law

firm, Osborn Maledon, did not do "an independent review" of Makings actions in connection with the funding decision. On the other hand, an equally reasonable inference can be drawn that the Osborn firm did not "do an independent review of [Makings'] actions[ ]" as to whether he breached any fiduciary duties generally. Given these competing inferences, taken together with the flaws in defendant's argument outlined above, summary judgment is not appropriate with respect to count five. Thus, the court denies defendant Makings' summary judgment motion as to count five of the FAC.

### B. Count 7—"Aiding and Abetting Breach of Fiduciary Duties By Professional Advisers and Consultants"

Count three of the FAC alleges a "Breach of Fiduciary Duties By Professional Advisers and Consultants: Against Eaton, AEG, and K & E[.]" FAC (doc. 121) at 76. Among other things, in an August 28, 2006, order this court granted K & E's motion for summary judgment as to that count. *See Mann v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 685, 707 (D.Ariz. 2006) Furthermore, Eaton and AEG entered into a stipulation of dismissal with prejudice as to all claims against them, including count three. *See id.*

Count seven relates to count three in that the former alleges "Aiding and Abetting Breach of Fiduciary Duties by Professional Advisers and Consultants[.]" FAC (doc. 121) at 81. "A claim for aiding and abetting a breach of fiduciary duty requires . . . (1) the existence of a fiduciary relationship; (2) a *breach* of that *duty;* (3) knowing participation by the non-fiduciary; and (4) damages." *In re American Business Financial Services, Inc.*, 2007 WL 510094, at *6 (Bankr.D.Del. Feb.13, 2007) (citation omitted) (emphasis added). Given that the underlying breach of fiduciary duty claim has not survived, defen-

dant Makings is entitled to summary judgment as to count seven because a critical element of this aiding and abetting claim is missing—the breach of a fiduciary duty by Eaton, AEG, or K & E. *See McGowan v. Ferro*, 859 A.2d 1012, 1041 (Del.Ch.2004) (granting summary judgment as to aiding and abetting breach of fiduciary duty count after granting summary judgment as to the underlying breach of duty of loyalty count), *aff'd without pub'd opinion*, 873 A.2d 1099, 2005 WL 1123388 (Del.2005). Accordingly, the court grants summary judgment in defendant Makings' favor as to count seven of the FAC.

### C. Count 18—"Aiding and Abetting Breach of Fiduciary Duty" and Count 19—"Breach of Fiduciary Duty"

The plaintiffs are bringing counts 18 and 19 against defendant Makings, along with several other defendants. Count 18 alleges aiding and abetting the breach of fiduciary duty against defendant Makings as well as others. Count 19 alleges that defendant Makings breached a host of fiduciary duties.

Defendant Makings is taking the position that because these fiduciary duty based claims are derivative in nature, they may only be pursued by the plaintiff trustee, and not by these individual plaintiffs. Plaintiffs did not respond to this argument. Regardless, whether the individual plaintiffs have standing to pursue these breach of fiduciary duty counts is thoroughly discussed in the order being issued contemporaneously herewith granting the GTCR defendants' summary judgment motion. For those same reasons, the court finds that the individual plaintiffs lack standing to pursue counts 18 and 19 against defendants Makings. Thus, the court grants defendant Makings summary

judgment motion with respect to counts 18 and 19.

## IV. Other Remaining Counts

The remaining causes of action, counts eight and nine, are being brought solely by the trustee. The court will address these counts seriatim.

### A. Count 8—"Aiding and Abetting Fraudulent Transfers"

Count eight of the FAC alleges that defendant Makings, among others, aided and abetted a fraudulent transfer, that is the ICG assets sale to Makings. Defendant Makings seeks summary judgment as to this count on three separate grounds. First he argues that the trustee lacks standing. Second, as did the GTCR defendants in moving for summary judgment motion, Makings argues that Arizona does not recognize a cause of action for aiding and abetting a fraudulent transfer. Third, even if Arizona did recognize such a cause of action, Makings contends that the trustee has not come forth with evidence to establish each of the elements necessary to sustain that cause of action.

Emphasizing that she is not bringing this claim on behalf of any specific creditor, relying upon 11 U.S.C. § 541(a)(1),[15] the trustee retorts that she does have standing "to bring pre-petition claims" on behalf of LeapSource, the bankrupt estate. Resp. (doc. 418) at 19. As to the viability of an aiding and abetting a fraudulent transfer claim, the trustee makes the identical argument which she did in opposing the GTCR defendants' summary judgment motion. More specifically, the trustee reiterates her view that "if there is liability for *conspiring* to assist a fraudulent transfer," as the New Jersey Supreme Court held in *Banco Popular North America v. Gandhi*, 184 N.J. 161, 876 A.2d 253 (2005),

"*a fortiori* ... there may also be liability for *aiding and abetting* a fraudulent transfer." Resp. (doc. 418) at 20. Insofar as the elements of this cause of action are concerned, plaintiff asserts that as to the underlying transfer itself "at best" there are disputed factual issues as to whether it was "for reasonable value." *Id.* at 22. Thus, in plaintiff's opinion, the court must deny summary judgment as to count eight.

Given the jurisdictional nature of standing, the court will address this defense argument first. *See Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (Standing "is perhaps the most important of [the jurisdictional] doctrines.") If defendant Makings' standing argument is sound in that the trustee lacks standing, then the court would not have jurisdiction to consider this particular claim.

### 1. Standing

The central premise of defendant Making's standing argument is that "[t]he trustee cannot hold [him] liable for aiding and abetting a fraudulent transfer since *no such claim exists* [.]" Mot. (doc. 340-2) at 25 (emphasis added). The existence of a claim is not the focus of a standing inquiry, however. "The standing doctrine determines 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *U.S. v. Lazarenko*, 476 F.3d 642, 649 (9th Cir.2007) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Thus, while the merits and standing often are closely related, "[s]tanding ensures that, *no matter the academic merits* of the claim, the suit has been brought by a proper party." *Arakaki v. Lingle*, 477 F.3d 1048, 1059 (9th Cir.2007) (emphasis added). Given this

15. That statute provides, *inter alia* that a bankruptcy "estate is comprised of ... all legal or equitable interests of the debtor[.]" 11 U.S.C. § 541(a)(1) (West 2004).

distinction between standing and the merits, for the moment, the court will disregard whether a cause of action exists for aiding and abetting a fraudulent transfer. Instead, the court will focus on the narrower issue of whether, assuming the existence of such a cause of action, the trustee is the proper party to pursue it.

In *Hamilton Taft & Company v. Howard, Weil, Labouisse, Friedrichs Inc.*, 176 B.R. 895 (Bankr.N.D.Cal.), *aff'd* on *other grounds*, 196 B.R. 532 (N.D.Cal.1995), *aff'd*, 114 F.3d 991 (9th Cir.1997), the bankruptcy court indicated that "[t]he Ninth Circuit has *squarely held* that a trustee's power to avoid fraudulent transfers does not enable a trustee to recover damages for aiding and abetting a fraudulent transfer." *Id.* at 902 (emphasis added). Relying strictly upon that language, with no other analysis, defendant Makings contends that "[t]he [plaintiff] trustee simply does not have standing[.]" *See* Mot. (doc. 340–2) at 25 (citation omitted).

 The court agrees that the trustee does not have standing here, but for reasons more nuanced than defendant Makings suggests. A careful reading of *Elliott v. Glushon*, 390 F.2d 514 (9th Cir.1967), the case which the *Hamilton* court relied to support its lack of standing argument, reveals that the Ninth Circuit in *Elliott* did not "squarely" hold that a trustee does not have standing to bring a claim for aiding and abetting a fraudulent transfer. Nonetheless, as will be seen, *Elliott* is somewhat instructive on the standing issue presently before the court.

In *Elliott* an attorney served as the escrow holder and attorney for those transferring property from the bankrupt.

The Court held that the trustee was not entitled to recover from that attorney for an allegedly fraudulent voidable transfer because the attorney never received an interest in the property. *Id.* at 517. The *Elliott* Court provided the following justification for its holding:

> The [Bankruptcy] Act carefully speaks of conveyances of property as being 'null and void,' and authorizes suit by the trustee to 'reclaim and recover such property or collect its value.' The actions legislated against are not 'prohibited'; those persons whose actions are rendered 'null and void' are not made 'liable'; and terms such as 'damages' are not used. The *legislative theory* is *cancellation, not* the *creation of liability* for the consequences of the wrongful act.

*Id.* (footnote omitted) (emphasis added).[16] As the foregoing demonstrates, standing was *not* an issue in *Elliott.*

Despite the fact that *Elliott* did not involve standing, the court in *Hamilton* adopted the *Elliott* Court's reasoning and applied it in the standing context. Based in part upon the *Elliott* Court's rationale, quoted above, the *Hamilton* court explicitly found that the trustee did not have standing to assert a claim for aiding and abetting a fraudulent transfer. *Elliott* was not the sole basis for the court's holding in *Hamilton* though. At the outset, the *Hamilton* court observed that in California a creditor may "recover civil damages from those who conspire to transfer property of a debtor to hinder, delay, or defraud creditors." *Hamilton*, 176 B.R. at 902 (citations omitted). Regardless, the *Hamilton* court hastened to add that the bankruptcy trustee "is not authorized to

---

**16.** The court is keenly aware that since *Elliott* the Bankruptcy Code has been recodified. Regardless of which version of the Code the court looks to, however, the common denominator is that the allegedly fraudulent transfer is voidable. In other words, whether in its prior form or in its recodified form, when dealing with potentially fraudulent transfers, the Code does not "creat[e] liability for the consequences of the wrongful act." *See Elliott*, 390 F.2d at 516.

pursue every action that creditors of the debtor might pursue." *Id.* (citations omitted). Implicit in the foregoing is the recognition that a creditor, in contrast to a bankruptcy trustee, may have standing to pursue such a state law based cause of action.

The bankruptcy court in *Hamilton* went on to explain that "[a] trustee's only authority to assert creditor's state-law causes of action related to fraudulent conveyances is found in section 544(b) of the Bankruptcy Code[,]" which "only permits the trustee to *avoid* a fraudulent transfer." *Id.* (footnote omitted). That section "does not authorize [a] Trustee to assert a claim for aiding and abetting a fraudulent transfer." *Id.* at 902. The foregoing reasons, in combination with *Elliott,* left the *Hamilton* court to conclude that the trustee "lack[ed] standing to sue Defendant for aiding and abetting a fraudulent conveyance." *Id.*

For the reasons just discussed, the court is persuaded that after *Hamilton* the trustee is hard-pressed to argue that she has standing to assert a cause of action for aiding and abetting fraudulent transfers. Moreover, it is no answer to Makings' standing argument to assert, as the trustee does, that she has standing to assert claims against him for breaches of fiduciary duties. *See* Resp. (doc. 418) at 19. That is not the issue at this juncture. Thus, the court finds that the plaintiff trustee does not have standing to assert a claim for aiding and abetting a fraudulent transfer as against defendant Makings. Consequently, the court grants defendant Makings' summary judgment motion as to count eight of the FAC.

### 2. Existence of a Cause of Action for Aiding and Abetting Fraudulent Transfers?

 Even if the court were to find that the trustee has standing to pursue a claim for aiding and abetting fraudulent trans-

fers, defendant Makings still would be entitled to summary judgment on count eight. Defendant Makings is entitled to that relief because, as discussed in this court's order issued contemporaneously herewith, granting summary judgment in favor of the GTCR defendants, "the court is convinced that Arizona's Supreme Court would adopt the majority view; there is no independent cause of action for aiding and abetting a fraudulent transfer under the UFTA [Uniform Fraudulent Transfer Act]." *Mann v. GTCR Golder Rauner, L.L.C.,* No. CIV 02–2099–PHX RCB, 2007 WL 968424 (D.Ariz. March 30, 2007).

Because the court has found that the trustee lacks standing, and because it is convinced that in any event, Arizona would not recognize a cause of action for aiding and abetting a fraudulent transfer, there is no need to address defendant Making's argument that the trustee cannot meet her burden of establishing each of the elements necessary to support such a cause of action.

### B. Count 9—"Trust Fund Doctrine"

 In count nine of the FAC plaintiffs invoke the trust fund doctrine, which "was judicially created to ensure that all creditors' claims are first equitably satisfied before stockholders may claim their rights upon the assets of an insolvent corporation." *A.R. Teeters & Associates, Inc. v. Eastman Kodak Company,* 172 Ariz. 324, 331, 836 P.2d 1034, 1041 (Ariz.Ct.App. 1992) (citations omitted). The trust fund doctrine provides that "[i]ndependently of statute, if corporate officers divide the assets among stockholders when the corporation is insolvent or where the corporation is thereby rendered insolvent, such officers are personally liable for corporate debts, or at least to the extent of the amount of assets received by them." *Realty Exchange Corporation v. Cadillac*

*Land and Development Company,* 13 Ariz. App. 232, 234, 475 P.2d 522, 524 (Ariz.Ct. App.1970) (internal quotation marks and citation omitted); *see also Southern Arizona Bank and Trust Co. v. U.S.,* 181 Ct.Cl. 426, 386 F.2d 1002, 1005 (1967) (citation omitted) ("Arizona follows the . . . rule that where stockholders of a corporation receive its assets on liquidation and leave it without sufficient property to pay its creditors, then those stockholders are required to respond to creditors up to the full vale of the assets received.") The theory underlying the trust fund doctrine "is that all of the assets of a corporation, immediately on its becoming insolvent, exist for the benefit of all of its creditors and that thereafter no liens nor rights can be created either voluntarily by operation of law whereby one creditor is given an advantage over others." *Teeters,* 836 P.2d at 1041 (internal quotation marks and citations omitted). After setting forth the elements necessary for a plaintiff to successfully invoke the trust fund doctrine,[17] the *Teeters* court unequivocally stated, "[l]iability, if established, is limited to the value of the assets received by the director, officer or stockholder." *Id.* (citations omitted).

 Defendant Makings posits that the trust fund doctrine claim fails as a matter of law because he was not a LeapSource stockholder or an officer at the time of the ICG asset sale.[18] As an aside, Makings notes that "[t]he transfer of the ICG assets was to ICG Group, Inc.[,]" and not to him "individually." Mot. (doc. 340–

2) at 29, n. 4 (citation omitted). Of course, as this court has previously held, from the date of its inception forward, Makings has been the ICG Group's "sole shareholder and sole director." *See Mann,* 351 B.R. at 708 (citations omitted). According to Makings, "even if the ICG Group is deemed to be [him], the trustee cannot show that the ICG asset sale 'disadvantage[d]' any other creditors of the same priority." Mot. (doc. 340–2) at 29.

The trustee completely disregards defendant Makings' argument that the trust fund doctrine is not a viable theory of liability because he was not a LeapSource director, officer or shareholder at the time of the ICG asset sale. Yet, as with the GTCR defendants, the court finds this argument determinative. Thus, it grants summary judgment in defendant Making's favor as to count nine as well.

## IV. Release

As part of the March, 2001, Purchase Agreement between LeapSource and ICG Group, Inc., those two entities, and defendant Makings, in his individual capacity, as well as in his capacity as president of ICG Group, entered into a "Mutual Release" dated March 30, 2001. *See* DSOF (doc. 341), exh. 19 thereto at 2. In part, that Release states:

> [I]n consideration of the covenants contained in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each

---

17. "To prevail on its trust fund doctrine claim, Kodak first must prove that (1) corporate assets were transferred to Teeters, (2) the transfer of corporate assets occurred while the corporation was insolvent, and (3) the transfer preferred Teeters to the disadvantage of other creditors of the same priority." *Teeters,* 172 Ariz. at 331, 836 P.2d 1034.

18. In moving on count nine, defendant presumed that plaintiff was seeking to invoke the

trust fund doctrine as to three separate transactions: (1) "[t]he transfer of the customer asset purchases[;]" (2) "[t] he compromising of debts to LeapSource"[;] and (3) "[t] he transfer of the ICG assets[.]" *See* Mot. (doc. 340–2) at 29. In opposing this aspect of Makings' motion, however, the trustee focused exclusively upon the ICG asset sale; and so, too, will this court.

of the Parties to this Mutual Release, the Parties agree as follows:

The Parties, . . . covenant not to sue or to cause others to sue one another . . ., on or from any and all claims, actions, causes of action, suits, debts, sums of money, accounts, covenants, contracts, agreements, representations, warranties, damages, injuries, liabilities and demands whatsoever, in law, equity, arbitration, administrative proceeding or otherwise[.]

*Id.* at 1–2. Based upon that language, which from Makings' standpoint is "straightforward and unambiguous[ ][,]" he broadly asserts that this Release "ends any and all liability questions on [his] behalf . . . and ICG Group[.]" Mot. (doc. 340–2) at 30 and 29. According to defendant Makings this Release, which he claims was "voluntarily entered into" by the parties, bars the present action. *See id.* at 29. Further, Makings contends that this Release operates as an "express[ ] waive[r]" by plaintiffs "of their known rights." *Id.* at 31. Therefore, not only should the court enforce this Mutual Release, but Makings urges the court to sanction the plaintiffs "for filing this suit that is antithetical to the very representations they made to Makings and ICG Group." *Id.*

Plaintiffs counter that "[a] mutual release given in a transaction that constitutes a fraudulent transfer or preference . . . does not protect a 'released party' from liability for engaging in the fraudulent transfer or preference because the release is voidable along with the rest of the transaction." Resp. (doc. 418) at 26. Put somewhat differently, because supposedly the ICG asset sale was fraudulent, plaintiffs reason that the Mutual Release, a part of that allegedly fraudulent transfer, is likewise voidable.

▉ Plaintiffs continue, "[t]he 'release' argument fails for the same reason that the Trustee is entitled to summary judgment previously moved for under Count III." *Id.* at 27. Of course, as mentioned earlier, the court denied this motion. One consequence of that denial is that it is now the law of the case that the ICG assets sale is *not* a preferential transfer within the meaning of section 548. The law of the case doctrine thus precludes the trustee's argument that the Mutual Release is invalid or voidable because it was part of a preferential transfer.

To rebut plaintiffs' argument, Makings states that "[p]laintiffs cannot prove any transfers were fraudulent, so their argument that the fraudulent transfer 'invalidates' the release is unsupported." Reply (doc. 447) at 18.

Despite the relatively forceful language which he employs, this is defendant Makings' last summary judgment argument, not his first. This suggests that Makings is likely aware of the inherent weakness in this argument, at least at this point in the litigation. As Makings impliedly concedes in his rebuttal, the validity of the release is intertwined with the fraudulent transfer issue under section 548 of the Bankruptcy Code. Thus, because in all likelihood the resolution of the validity of the release turns upon whether the ICG asset sale was a fraudulent transfer, the court leaves that issue for another day.

For all of the reasons set forth above,

IT IS ORDERED that defendant Michael Making's motion for summary judgment pursuant to Fed.R.Civ.P. 56 (doc. 340) is GRANTED IN PART and DENIED IN PART, as hereinafter ordered.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 1, "Tortious Interference with Contract," is GRANTED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary

judgment as to count 21, Tortious Interference with Senior Management Agreements and Employment Agreements, is GRANTED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 23, Tortious Interference with Stockholders Agreement and Purchase Agreement, is DENIED as to the Stockholders Agreement, but GRANTED as to the Purchase Agreement.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 5, "Breach of Fiduciary Duty By Directors and Officers[,]" is DENIED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 7, "Aiding and Abetting Breach of Fiduciary Duties by Professional Advisers and Consultants," is GRANTED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 18, "Aiding and Abetting Breach of Fiduciary Duty," is GRANTED.

IT IS FURTHER ORDERED that defendant Making's motion for summary judgment as to count 19, "Breach of Fiduciary Duty," is GRANTED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 8, "Aiding and Abetting Fraudulent Transfers," is GRANTED.

IT IS FINALLY ORDERED that defendants Makings' motion for summary judgment as to count 9, "Trust Fund Doctrine," is GRANTED.